2010 Ark. App. 364

**Jimmie CARPENTER, Appellant**

v.

**Rory LAYNE and Kathy Layne, Appellees.**

**No. CA 09–1236.**

Court of Appeals of Arkansas.

April 28, 2010.

Rehearing Denied June 2, 2010.

Michael Hamby, Michael Hamby, P.A., Greenwood, Jerry D. Pruitt, Fort Smith, for appellant.

RITA W. GRUBER, Judge.

Appellant Jimmie Carpenter sued appellees, Rory and Kathy Layne, for conversion and for collection of money he contended that he loaned to appellees. After a hearing, the circuit court found that all payments made to the Laynes were authorized and, therefore, that there was no conversion and that all money loaned by Mr. Carpenter to the Laynes had been repaid in full. We find no clear error and affirm the trial court's order.

Mr. Carpenter, an eighty-two-year-old man, was married to Mr. Layne's step-grandmother until she died in 2003. Mr. Carpenter and Mr. Layne did not have much contact, however, until 2001. In 2001, while the Carpenters were living in California and Mr. Layne was living in Arkansas, Mrs. Carpenter called Mr. Layne to ask him if he would come and help her take care of Mr. Carpenter while he was recovering from a broken hip. Mr. Layne spent part of November and December in California. Mr. Layne testified that, while he was in California, he told the Carpenters that he would like to be able to buy "his own place" and that they expressed their willingness to help.

Shortly after Mr. Layne returned to Arkansas, he called Mr. Carpenter and told

him that he had found some property. Mr. Carpenter gave Mr. Layne $50,604 in January 2002, and Mr. Layne used the money to buy 33.5 acres of land, on which he put a house trailer. Mr. Layne testified that Mr. Carpenter did not mention repayment of the money, and Mr. Layne did not sign a note or mortgage. Several weeks later, the Carpenters told Mr. Layne that they wanted something in writing to ensure that if something happened to him, they would get the $50,000 back. Mr. Layne prepared a will stating that, in the event he predeceased the Carpenters, "I wish to return to them the amount of $50,000 from my estate before any other requests." He sent the will to the Carpenters, and nothing more was said about the money until this lawsuit.

Mrs. Carpenter passed away in December 2003, and Mr. Carpenter began calling Mr. Layne "crying, complaining, and depressed." Mr. Layne testified that Mr. Carpenter asked him to move to California. Mr. Layne said that he could not, but he told Mr. Carpenter that he could move to Arkansas and he would help him. In February 2004, Mr. Carpenter had a power of attorney prepared for Mr. Layne and mailed it to him. In April 2004, Mr. Carpenter stayed with Mr. and Mrs. Layne to see if he wanted to move to Arkansas. He decided to move and bought a lot in Greenwood on which to build a house. He returned to California for several months, sold his home, and then lived with the Laynes for four months while his house was being completed.

Both Mr. Carpenter and Mr. Layne testified that, between 2004 and 2006, Mr. Carpenter loaned the Laynes money to pay for various repairs and improvements to Mr. Layne's property. Mr. Layne also testified that, from 2004 through 2006, he helped Mr. Carpenter with chores around his house. On May 18, 2006, Mr. Carpenter was diagnosed as being legally blind. After he became legally blind, Mr. Carpenter took Mr. Layne to Arvest Bank and had Mr. Layne's name added to his account. Mr. Layne began helping Mr. Carpenter pay his bills. Mr. Layne also testified that Mr. Carpenter stopped driving and that, if he needed to go anywhere, either he or Mrs. Layne would take him. In March 2007, using his power of attorney, Mr. Layne had his name added to Mr. Carpenter's account at Farmer's Bank. The parties dispute whether Mr. Carpenter authorized this action. Up until this point, Mr. Layne had not written any checks on Mr. Carpenter's account that benefitted him or Mrs. Layne.

Mr. Layne testified that, in May 2007, he spoke with Mr. Carpenter and Bea Stadler, a friend of Mr. Carpenter's, about Ms. Stadler's suggestion that Mr. Carpenter be put in a nursing home because he could not take care of himself. Ms. Stadler testified that this conversation occurred in May 2006. In any case, Mr. Layne testified that he offered, instead, to take care of Mr. Carpenter for $25 per hour. Mr. Layne testified that Mr. Carpenter said it was a good idea; Mr. Carpenter testified that Mr. Layne offered to take care of him for $15 per hour and he told Mr. Layne that he wasn't interested in that. Mr. Layne testified that he began taking care of Mr. Carpenter and paying all of his bills in May 2007 under an agreement with Mr. Carpenter that he would pay him $25 per hour. Shortly thereafter, he and Mrs. Layne realized that $25 an hour was too much given the number of hours Mr. Layne was devoting to Mr. Carpenter's needs and agreed that $2,000 a month was fair. He testified that he and Mr. Carpenter thereafter agreed on the flat rate of $2,000 per month.

Mr. Layne testified that Mr. Carpenter would stack his mail in sorted piles on his

kitchen table and that he and Mr. Carpenter would sit down at the table together and pay bills. He testified that he wrote 99% of the checks on both the Arvest and the Farmer's accounts. Mr. Layne stated that he wrote the $2,000 check each month to his wife because she did most of the banking in his family. He testified that he never discussed making the checks payable to Kathy Layne because Mr. Carpenter never asked. "Everything was on the table and we just paid bills. I would just tell him that I was getting paid." He also testified that Mr. Carpenter was very careful about watching his business and that he would read the bills and bank statements in his viewer. In addition to the monthly checks to Mrs. Layne for $2,000, there were several checks for other amounts payable to Mr. Layne. Mr. Layne explained a check in the amount of $500 on June 5, 2007, as a gift from Mr. Carpenter because Mr. Layne was not working and was behind on his bills. He explained a check in the amount of $650 as additional money from Mr. Carpenter to pay insurance that was due that Mr. Layne did not have money to pay. A check payable to Mr. Layne in the amount of $2,400 was the monthly $2,000 plus $400 for a pallet of pellets for which Mr. Carpenter was reimbursing Mr. Layne. He testified that a check to Barling Boat Sales in the amount of $327.69 was for a GPS for his boat. He said that he and Mr. Carpenter were looking at some things in the boat store and that Mr. Carpenter bought it for him because he liked to fish.

With regard to the alleged loans, Mr. Layne testified that Mr. Carpenter loaned him $6,466: $5,000 to put in a driveway and sidewalk, $266 for additional brick work, and $1,200 for siding. He testified that he and his wife repaid the money that Mr. Carpenter loaned to them in installments of $200 per month and then in installments of $400 per month between April 2004 and April 2006, when the loan was paid off. Mr. Layne introduced cancelled checks and his wife's recorded ledger to support this testimony. He testified that Mr. Carpenter acknowledged in April 2006 that the loan was paid off and that the parties were on good terms. He testified that the alleged loans for which Mr. Carpenter was seeking repayment had been gifts: $50,000 for the land; $7,000 for siding, which Mr. Carpenter paid directly to the siding contractor; $4,500 for brick work, also paid directly to the contractor; and $4,000 to $5,000 in other gifts. He testified that none of the loans were put in writing and that Mr. Carpenter did not mention these alleged loans until he filed a complaint.

Mrs. Layne testified that she would occasionally go with her husband to Mr. Carpenter's when they were paying bills. She said that when they arrived, the bills would be on the kitchen table in sorted piles: junk mail, bills, and bank statements. She said that Mr. Carpenter would say that he had looked through the bank statements with his magnifying viewer and would put them in his black notebook. Then he and Mr. Layne would discuss the bills and pay them. Mr. Carpenter might get out his magnifying glass to look, Mr. Layne would write the checks, and they would put them in envelopes. She testified that Mr. Carpenter would tell her from time to time that she should take the checks to the bank because he did not like them lying around. With regard to the loans, she testified that they had borrowed $6,466 from Mr. Carpenter; that she kept a ledger documenting the loan and the installment payments; and that the loan was paid in full in April 2006. She testified that Mr. Carpenter had not demanded money for repayment of alleged loans from April 2006 until he filed a complaint two years later.

Ms. Stadler testified that Mr. Carpenter told her from time to time that he gave money to Mr. Layne. She said it was apparent that he trusted Mr. Layne. She also testified that Mr. Layne would drive Mr. Carpenter from Greenwood to visit her in Harrison three or four times a year. She testified that Mr. Carpenter paid for her to take a trip to Alaska with him.

John Phillips, a friend of the Laynes, testified that he had been with Mr. Carpenter at the Laynes' for dinner once. He said he got the impression from Mr. Carpenter that he had paid for the new concrete, brick work, and siding at the Laynes' home as a gift. He said after he moved away, he often called Mr. Layne and Mr. Layne would be driving Mr. Carpenter to the doctor in Little Rock or taking him to Harrison. He said that he thought Mr. Layne spent a considerable amount of time with Mr. Carpenter.

Mr. Carpenter denied that he agreed to pay Mr. Layne for his help. He also denied that Mr. Layne was taking care of him. Rather, he said that Mr. Layne came to the house only about four times per month to help him. He often called Mr. Layne, he said, because he wanted to "see how he was" and "just chit chat with him." He admitted that he would also call him to set up an appointment for Mr. Layne to drive him to the doctor or to the grocery store about once a week. He testified that he did not authorize Mr. Layne to become a signator on his Farmer's Bank account and that he had no idea Mr. Layne was writing checks to Mrs. Layne on that account. He denied authorizing any of the checks written to Mr. or Mrs. Layne or on their behalf. But he did admit that he gave gifts to people "all of the time." He said that when Ms. Stadler's granddaughter needed a car, he gave her $2,000 to help. He also testified that he gave gifts of money to his friend, Mr. Ballard. He

said that he bought Mr. Layne a full bedroom set and gave him a $1,000 rifle. While Mr. Carpenter admitted on cross-examination that the $50,000 he gave to Mr. Layne for the property was not a loan but a gift, he denied that any other money he spent on the Laynes' home was a gift. At the close of Mr. Carpenter's case, the court granted the Laynes' motion to dismiss Mr. Carpenter's claim regarding this alleged $50,000 loan.

With regard to the other allegedly unpaid loans, he testified that he kept track of his loans to Mr. Layne on a piece of paper, introduced as an exhibit at trial. In addition to the amounts listed by the Laynes on their document detailing the loans and payments, Mr. Carpenter contended that amounts of $1,961.72, $2,316, and $500 for brick work at the Laynes' home were loans, not gifts as Mr. Layne contended. He also listed as a loan the amount of $4,500 for a driveway that Mr. Layne claimed was a gift. Finally, Mr. Carpenter contended that $7,996 for siding was not a gift, as Mr. Layne claimed, but a loan. Mr. Carpenter did not recall telling Mr. Layne that only $1,200 of that amount was being loaned and that the remainder was a gift. Finally, his explanation for why payments stopped in early 2006 without his making further demand for payment on the Laynes was that Mr. Layne lost his job with the mining company and could not afford to make payments at that time. He said that he assumed payments would resume once Mr. Layne began working.

On March 5, 2008, after returning from eating together, the parties came to an impasse. Mr. Carpenter confronted Mrs. Layne with a cancelled check made out to her on his account and accused her of stealing from him. She denied any wrongdoing and left Mr. Carpenter's house. Mr. Layne attempted to remind Mr. Carpenter

of their alleged agreement, but he was unable to reconcile with him. The parties have not spoken since that day.

Mr. Carpenter then filed a complaint against the Laynes, alleging that they had converted $22,049.09 from his bank accounts and that they had failed to pay back $61,077 loaned to them by Mr. Carpenter. After a bench trial, the trial court entered a judgment on May 13, 2009, finding against Mr. Carpenter on both claims. Specifically, the court found that Mr. Carpenter worked for forty years as a bookkeeper at Edison Electric, had been financially successful, had accumulated assets, and thus was knowledgeable about financial affairs. The court found that Mr. Carpenter requested Mr. Layne's help with his affairs, agreed to pay him $2,000 each month for his services, and was aware of the $2,000 monthly payments written by Mr. Layne. The court also found that Mr. Carpenter had a history of making gifts to others in addition to the Laynes. The court found that, although a fiduciary relationship existed between Mr. Carpenter and Mr. Layne, Mr. Layne did not put Mr. Carpenter in a position of fear, exercise a controlling influence over him, or overreach Mr. Carpenter in any of their financial dealings. The court also found that Mrs. Layne was not involved in any of the financial dealings with Mr. Carpenter and granted her motion to dismiss the claims against her. Finally, the court found the testimony of the Laynes persuasive and found that the money loaned to them by Mr. Carpenter had been repaid in full. Accordingly, the court dismissed the case. Mr. Carpenter brought this appeal.

Our standard of review on appeal from a bench trial is whether the trial judge's findings were clearly erroneous or clearly against the preponderance of the evidence. *McQuillan v. Mercedes–Benz Credit Corp.*, 331 Ark. 242, 249, 961 S.W.2d 729, 733 (1998); Ark. R. Civ. P. 52(a). We view the evidence in a light most favorable to the appellees, resolving all inferences in favor of the appellees. *See McSparrin v. Direct Ins.*, 373 Ark. 270, 272, 283 S.W.3d 572, 574 (2008). Disputed facts and determinations of the credibility of witnesses are within the province of the factfinder. *McQuillan*, 331 Ark. at 249, 961 S.W.2d at 733.

Mr. Carpenter's first point on appeal is that the trial court erred in finding that Mr. Layne did not unduly influence Mr. Carpenter or convert Mr. Carpenter's money from his bank accounts. We note first that Mr. Carpenter's complaint did not allege undue influence. The trial court did make a finding, however, that although a fiduciary relationship existed, Mr. Layne did not put Mr. Carpenter in a position of fear, exercise a controlling influence over Mr. Carpenter, or overreach him in any of their financial dealings. The court found that Mr. Carpenter was strong-willed and self-reliant and that he was aware of all of the financial transactions between the parties.

It is undisputed that the parties were in a fiduciary relationship: a person who holds a power of attorney is an agent, and "a fiduciary relationship exists between principal and agent in respect to matters within the scope of the agency." *Dent v. Wright*, 322 Ark. 256, 261, 909 S.W.2d 302, 304 (1995). But there is no undue influence in the transfer of property "when there has been no showing that the donees said or did anything to put the donor in a position of fear or that they committed fraud on her or overreached her in any way." *Id.* Mr. Carpenter never testified that he was afraid of Mr. Layne. Further, we find no clear error in the trial court's finding that the parties entered into an agreement pursuant to which Mr. Carpenter would pay Mr. Layne $2,000

per month for his services and that Mr. Carpenter was aware that Mr. Layne was writing these checks each month.

■ Mr. Carpenter also argues that the court erred in finding that Mr. Layne's actions were authorized. Conversion is a common-law tort action for the wrongful possession or disposition of another's property. *McQuillan*, 331 Ark. at 247, 961 S.W.2d at 732. One commits the tort of conversion when he wrongfully commits a distinct act of dominion over the property of another which is inconsistent with the owner's rights. *Dent*, 322 Ark. at 262, 909 S.W.2d at 305.

■ In this case, Mr. Layne had authority to write checks on both accounts because he held a power of attorney and was a signator on both accounts. Mr. Layne testified that he and Mr. Carpenter agreed that he would be paid $2,000 each month as payment for his help. Mr. Layne also testified that the additional amounts given to him or Mrs. Layne were gifts from Mr. Carpenter. Although Mr. Carpenter disputed this testimony, the court apparently believed Mr. Layne. The testimony of an interested party is taken as disputed as a matter of law. *Ester v. Nat'l Home Ctrs., Inc.*, 335 Ark. 356, 981 S.W.2d 91 (1998). Further, where the pivotal issue is the credibility of interested parties whose testimony is in direct conflict, we defer to the trial judge's determination. *Taylor v. George*, 92 Ark.App. 264, 271, 212 S.W.3d 17, 23 (2005). The trial judge, as the finder of fact, found the testimony of Mr. Layne to be more credible than the testimony of Mr. Carpenter and resolved any conflicts in the testimony in Mr. Layne's favor; we are bound by his determinations and hold that his finding was not clearly erroneous.

■ For his next point on appeal, Mr. Carpenter contends that the trial court erred in dismissing his claim against Mrs. Layne for the checks written to her. A motion to dismiss is identical to a motion for a directed verdict in a jury trial and is a challenge to the sufficiency of the evidence. *Drummond v. Shepherd*, 97 Ark. App. 244, 246, 247 S.W.3d 526, 528 (2007). On appeal, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible therefrom. *Id.* A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.*

■ In this case, the court granted Mrs. Layne's motion to dismiss because it found that Mr. Carpenter dealt only with Mr. Layne and that Mrs. Layne did not have anything to do with the alleged conversion of funds or the loans to Mr. Layne. Mr. Layne was responsible for putting her name on the checks. Both Mr. and Mrs. Layne testified that Mrs. Layne was not part of the conversation when Mr. Carpenter and Mr. Layne agreed upon payment for services; Mr. Carpenter denied that any conversation had taken place. There was no testimony that Mrs. Layne wrote any of the checks or got involved in any of Mr. Carpenter's finances. The testimony established that the checks were made out in her name as a convenience. Finally, Mr. Carpenter himself testified that he dealt with Mr. Layne and loaned money to Mr. Layne. Mr. Carpenter made no showing that Mrs. Layne had any involvement in the alleged conversion or that he loaned her any money. Therefore, it was not error for the trial court to dismiss the claim against Mrs. Layne.

Finally, Mr. Carpenter contends that the trial court erred in dismissing his claim against the Laynes for repayment of outstanding loans. Once again, the court heard conflicting testimony on this issue and reviewed conflicting documentary evidence. Resolution of conflicts in testimony and assessment of witness credibility are for the finder of fact. *Loy v. State*, 88 Ark.App. 91, 195 S.W.3d 370 (2004). The court found the Laynes' testimony regarding the loans persuasive. We hold that the court's finding was not clearly erroneous.

Affirmed.

VAUGHT, C.J., and GLOVER, J., agree.