2012 Ark. App. 641

**Paul Dean HANKINS, as Administrator of the Estate of Willis N. Hankins and as Administrator of the Estate of John Paul Hankins, Sr., Appellant**

v.

**Sally AUSTIN, Bancorp South, and Jay Knight, Appellees.**

No. CA 11–1200.

Court of Appeals of Arkansas.

Nov. 7, 2012.

Rehearing Denied Jan. 9, 2013.

Elton A. Rieves III & Associates, by: Elton A. Rieves III, West Memphis; and Michael D. Snell, Little Rock, for appellant.

Jeremy B. Lowrey and L. Gray Dellinger, Melbourne, for appellee Sally Austin.

Gregg, Farris & Bumpers, Batesville, by: John C. Gregg, for appellee Bancorp South.

DOUG MARTIN, Judge.

Appellant Paul Dean Hankins, as administrator of the estate of Willis N. Hankins and as administrator of the estate of John Paul Hankins, Sr. (the estate),[1] appeals from the Izard County Circuit Court's determination that the estate failed to prove that Willis was incompetent, lacked sufficient mental capacity, or was unduly influenced by appellee Sally Austin at the time he signed a special warranty deed conveying property described as "the Hankins farm" to Sally. The trial court further found that the estate failed to prove that Sally and appellees Jay Knight and Bancorp South lacked authority to complete a personal check signed by Willis in the amount of $47,800. The estate argues that the trial court clearly erred in its determinations. We affirm.

Zelma Hankins, mother of Willis and John Paul Hankins, Sr. (John Sr.), died in 1993 and left the Hankins farm in Calico Rock to Willis, who had lived with and cared for Zelma until she entered a nursing home. Willis and Sally began a relationship in 1991 and lived together as companions for approximately fifteen years but never married. In fact, Willis had never been married and had no children. John Sr. was married and had two sons, John Paul Hankins, Jr. (John Jr.), and Paul. John Sr. and John Jr. had a falling out; however, John Jr. remained close to Willis and helped him on the Hankins farm. On February 28, 2007, Willis was diagnosed with terminal cancer and was told to "get his affairs in order." Willis died on March 16, 2007. At issue in this appeal are a deed signed on March 14, 2007, and filed on March 15, 2007, and a check signed on March 13, 2007, and deposited on March 16, 2007.

1. When the initial complaint for cancellation of deed was filed on July 6, 2007, Paul Dean Hankins, as administrator of the estate of Willis N. Hankins, and John Paul Hankins, Sr., the decedent's heir at law, were the plaintiffs. On November 25, 2010, John Paul Hankins, Sr., died, and his estate was substituted as a proper plaintiff.

## I. *Trial—November and December 2010*

Paul, Willis's nephew, testified that he did not know that Willis was ill until John Jr. called him on the day that Willis died. Paul testified that, between 5:30 p.m. and 8:00 p.m. on Friday, March 16, Willis was not conscious. With regard to the deed at issue, Paul testified that he believed bank manager Jay Knight falsified the acknowledgment on the deed because Knight was a land developer who hoped to obtain Willis's land. Paul denied instructing his lawyers to offer to drop Knight from the lawsuit if Knight would "come clean" and admit that he did not see Willis sign the deed. Paul stated that he did not believe that Zelma's action of deeding the Hankins farm to Willis caused his father John Sr. "any heartache" because John Sr. already owned a farm, adjoining the Hankins farm. According to Paul, it was understood that, if something ever happened to Willis, the farm would stay in the family.

Thomas Vastrick, a forensic-document examiner, testified that, after comparing known writing specimens containing Willis's signature, he had concluded that it was "highly probable" that Willis signed a check in the amount of $47,800 but that Willis did *not* sign the deed. Vastrick testified that "highly probable" meant "virtually certain." Vastrick testified, however, that various factors can affect a person's signature, including the position of the person in relation to the document, age and illness, and effects of medication. Vastrick testified that there was no way to scientifically quantify how loss of muscle strength, as is common with cancer patients, would alter a person's ability to sign his name and that this would differ from person to person.

Jay Knight, branch manager and assistant vice president of Bancorp South, testified that Sally was a customer of the bank but that Willis was not. Knight testified that, in response to a telephone call from Sally, he notarized a deed at Willis's home on March 14, 2007. Knight stated that Willis referred to him as "Mr. Knight" and asked about his wife, father-in-law (Dr. Robert Lane), and kids. Knight testified that Willis seemed alert but appeared frail. Knight stated that Willis's mind seemed "okay," his conversation was "normal," and his responses were appropriate. Knight stated that Willis sat in a recliner beside the front door; Willis already had the deed in his hands; and Willis signed it and wrote "March 14." Knight acknowledged that Willis's penmanship was slow. Willis gave the deed to Knight after signing it; Knight crossed out the year 1997 and wrote 2007; and Willis placed his initials beside that change. Knight then notarized the deed. Knight testified that he felt as though Willis signed the deed of his own free will. Knight testified that there was no business venture with which he was associated where he stood to gain something from notarizing the deed.

Knight further testified that, on March 16, 2007, Sally came to Bancorp South and asked him to deposit four checks. One First Security Bank check was completely blank, except for Willis's signature. Sally asked Knight to complete the check and write $47,800 as the amount. Knight did as Sally requested. Knight admitted that he did not call Willis to verify whether he had in fact signed the check, whether Willis had $47,800 at First Security Bank, or whether Willis had authorized Sally to deposit the check into her account. Knight testified, however, that no banker verifies a check in such manner when it is presented for deposit. Knight stated that he would have complied with Sally's request even if the president of the Bancorp South banks in Arkansas had been present in his office.

John Jr., Willis's nephew, testified that, on March 14, 2007, he and his wife arrived at Willis's home between 10 a.m. and noon and stayed overnight. John Jr. did not recall anyone coming to Willis's house to notarize a deed. John Jr. first became aware of the deed when Sally showed him the deed on March 15 or 16 and explained that it was "the way Willis wanted it." According to John Jr., Sally told him that the deed was signed on Wednesday night and notarized the next day. When asked about Willis's mental capacity during Willis's final days, John Jr. stated that Willis was in a great deal of pain and that occasionally he was not lucid because the pain overcame him. Likewise, John Jr.'s wife of twelve years, Katherine, testified that Willis "was not very lucid." John Jr. testified that he knew that his grandmother Zelma had deeded the Hankins farm to Willis while she was in a nursing home but that his family was "very secretive on their business." John Jr. testified that John Sr. and Willis did not have much to do with each other for a twenty-year period. John Jr. described Willis as a quiet man and said of his father, "[John Sr.'s] way was the only right way, or it was no way." John Jr. testified that Willis never told him what he planned to do with the farm in the event of his death but that it did not surprise him that Willis did not leave the farm to John Sr.

Linda Ward, a licensed practical nurse (LPN) working for Community Medical Center, Home Health and Hospice, testified that she met Willis when Zelma was in the hospital and that she met Sally at the nursing home where Zelma resided before her death. Ward testified that she and Sally, also an LPN, had a professional relationship. Ward testified that hospice workers visited Willis from March 1 through March 16, and that each visit usually lasted approximately thirty minutes. Ward stated that Willis took several medications, including pain killers and sedatives. Ward stated that Willis was disoriented and confused at times, likely due to the medication, but that there were times when Willis was cognitive and alert; he knew exactly what his condition was; and he could remember dates, places, and times. Ward testified, however, that she was not present when Willis signed the check and deed. Ward stated that, while she received most information from Sally, Willis directly communicated with her regarding his pain. Ward testified that she knew from talk in the community that Willis and John Sr. had a falling out and that her understanding was that it was because Zelma had deeded the Hankins farm to Willis.

Maurice Seay, Willis's first cousin, testified that he was with Willis from March 1 through March 16 because he came every day to feed Willis's cattle. Maurice testified that Willis's ability to focus and "conversate" did not worsen over the last week of Willis's life. Maurice stated that Willis's mind was "just as clear as it could be" until Willis went into a coma. Maurice testified that Willis told him around March 6 or 7, "I need you now. After I'm gone, I'll need you worse. If you will help me through this, I can die with some dignity and pride ... because I don't have any help, there was nobody to help me except Sally." According to Maurice, Sally and Willis were devoted to each other. Maurice testified that, when his aunt Zelma deeded the Hankins farm to Willis, it created a "big sore spot" between Willis and John Sr. Maurice testified that Willis would not want John Sr. to have anything he owned.

Mark Seay, Willis's second cousin, testified that he visited Willis a few days before he died and that Willis's mind "seemed clear as a bell." Mark noted that Willis responded logically to questions.

Mark testified that Sally and Willis appeared to be devoted to each other and were always together. Mark testified that Willis and John Sr. were estranged because his great aunt Zelma had left the Hankins farm to Willis.

Rudean Lester, John Sr.'s widow, testified that she visited Willis three times when he was in hospice care and that Willis acted like he always did. Lester said that Willis was weak physically, but mentally, he "talked fine" to her. Lester testified that Sally and Willis "seemed real comfortable together." Lester said that, during the time that Willis and Sally lived together, Willis told her that he loved Sally, or else Sally would not be there. Lester stated that she did not recall seeing Willis and John Sr. together at all in the twenty years prior to Willis's death.

Sally Austin testified that she began working at the nursing home where Zelma was a resident in October 1990, met Willis there, and moved in with Willis on June 4, 1991. Sally testified that, in 1997, she and Willis went to her farm in Monticello and that the deed was prepared there by a lawyer that Sally had recommended to Willis because the lawyer had handled some probate matters involving Sally's mother. Sally testified that Willis went all the way to Monticello because he said that he did not trust anyone around his hometown and did not think it was anyone's business. According to Sally, Willis did not execute the deed in 1997 because "that wasn't what [their] relationship was about." Sally testified that she told Willis that she did not want him to sign the deed at that time, so Willis told her to put it away. On March 14, 2007, Willis instructed Sally to get the deed from the closet where it was stored. Sally testified that she saw Willis sign and initial the deed. It was her opinion that Willis was lucid and "cognitive" and that he knew what he was doing at that time. Sally testified that Willis intended to give her everything that he owned. Sally denied telling John Jr. that Willis signed the deed on Wednesday night and had it notarized on Thursday.

According to Sally, on March 13, 2007, Willis called First Security Bank and spoke with a woman about putting Sally's name on his bank account. Willis explained to the woman that he was dying, but the woman told Willis that he would have to go to the bank in Mountain Home in person to have Sally's name placed on his account. After that conversation, Willis told Sally to get his checkbook. Sally testified that Willis signed a check and "he said you get my money, them son of a bitches aren't getting my money, you're going to need it . . . ." Sally said that Willis consulted some documents and then told her the amount he wanted written on the check: $47,800.

On the morning that Willis died, Sally was sent by hospice to pick up a prescription for Willis, and Sally stopped by Bancorp South. Sally testified that, instead of waiting in line for a teller, she went to Knight and asked for his help so that she could get out of the bank quickly. Sally testified that she told Knight that Willis had signed the check, told him what had happened with First Security, and told him the amount she wanted written on the check was $47,800. Sally testified that, as of March 14, Willis's balance at First Security Bank was $47,846.72.

Alodia Hankins, Paul's ex-wife, testified that, while she had heard all of the testimony regarding a long-running feud between John Sr. and Willis, it was not true. Alodia testified that, after John Sr. and Paul did not attend Zelma's funeral, "assumptions were made and hard feelings were had." Alodia's understanding was that Zelma had told John Sr. that she deeded the Hankins farm to Willis because

John Sr. had so much and Willis had nothing. Alodia testified that she thought John Sr. was not upset about Zelma's action because he believed that the land would stay in the family in that John Jr. and Paul would inherit the land from Willis. Alodia testified that John Sr. did not know that Willis had cancer.

Dr. Robert Lane testified that he had practiced medicine in Calico Rock for over forty years and that he began treating Willis in early February 2007. Tests revealed that Willis had cancer, and Dr. Lane described Willis's prognosis as "very, very poor." Dr. Lane told Willis that, because his cancer was aggressive, his life expectancy was not very long and that he needed to get his affairs in order. Dr. Lane testified that anyone with a terminal illness becomes weaker, which can affect fine-motor skills, and that the side effects for many of the medications Willis was prescribed could cause dizziness, drowsiness, lack of coordination, and hallucinations. Dr. Lane opined that, although Willis was prescribed such medications, it was entirely possible that he remained lucid. Dr. Lane could not testify that Willis was lucid at the times he signed the deed and check but stated that the only way to determine Willis's lucidity was to be there and interact with him.

## II. *Trial Court's Ruling—May 21, 2011*

The trial court found that Willis and Sally shared a harmonious and loving relationship and that Willis and John Sr. had no significant, cordial, or civil relationship from the early 1990s until 2007. Regarding the deed, the trial court found that the estate failed to prove by clear and convincing evidence that Willis was incompetent, lacked sufficient mental capacity, or was unduly influenced by Sally. Rather, the trial court found that Willis was of sound mind, acting freely, voluntarily, and without coercion at the time the deed was executed. The trial court noted that it found Knight to be "particularly credible" and that Knight saw Willis signing the deed. The trial court noted that, although Vastrick was sincere in his opinion that the deed was forged, his opinion was just that—an opinion—and Vastrick had admitted that he could not take into consideration factors such as muscle strength and effects of medication, both of which could have influenced Willis's signature.

Regarding the check, the trial court noted that the parties stipulated that the check for $47,800 was signed by Willis. The trial court found that Sally had actual and apparent authority from Willis to complete the check and that the check therefore did not qualify as an "altered" instrument. The trial court found that Knight completed the check as instructed by Sally and in accordance with the authorization of Willis, as relayed to him by Sally. The trial court concluded that the estate failed to show lack of authority.

## III. *Standard of Review*

Although we review traditional equity cases de novo, the test on review is not whether we are convinced that there is clear and convincing evidence to support the trial court's findings but whether we can say that the trial court's findings are clearly erroneous. *Berry v. Walker*, 2012 Ark. App. 16, 2012 WL 11263. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake was made. *Id.* In reviewing a trial court's findings of fact, we give due deference to the trial judge's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Munzner v. Kushner*, 2010 Ark. App. 196, 375 S.W.3d 647.

## A. The Special Warranty Deed

■ First, the estate argues that the deed was invalid because it was forged, given the handwriting expert's opinion that the signature on the deed was not Willis's and in light of the suspicious circumstances surrounding the deed's execution. It was within the trial court's province to determine the weight to be given the expert's opinion. *Munzner, supra.* The trial court recognized the limitations of Vastrick's opinion and chose to rely, instead, on Knight's testimony that he was present and saw Willis signing the deed. We cannot say the trial court clearly erred in relying on Knight's testimony in determining that the deed was not forged.

■ Alternatively, the estate contends that the trial court imposed the wrong burden of proof in determining that Willis had sufficient mental capacity to execute the deed. The estate argues that, because Sally procured the deed and was the dominant party in a confidential relationship with Willis, the burden shifted to Sally to prove beyond a reasonable doubt that Willis had sufficient mental capacity and was not unduly influenced. *See, e.g., Looney v. Estate of Wade,* 310 Ark. 708, 839 S.W.2d 531 (1992); *Birch v. Coleman,* 15 Ark.App. 215, 691 S.W.2d 875 (1985). The estate, however, failed to obtain a ruling from the trial court as to whether Sally procured the deed and whether a confidential relationship existed between Willis and Sally. Our courts have repeatedly held that a party's failure to obtain a ruling is a procedural bar to this court's consideration of the issue on appeal. *Roberts v. Jackson,* 2011 Ark. App. 335, 384 S.W.3d 28. The burden of proof remained on the estate, as the party challenging the deed, to prove mental incapacity by a preponderance of the evidence. *Estate of McKasson v. Hamric,* 70 Ark.App. 507, 20 S.W.3d 446 (2000).

■ If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory without prompting the extent and condition of his property and to comprehend how he is disposing of it and to whom and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. *Richard v. Smith,* 235 Ark. 752, 361 S.W.2d 741 (1962) (quoting *Pledger v. Birkhead,* 156 Ark. 443, 246 S.W. 510 (1923)). Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. *Id.* If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him. *Id.* Evidence of the grantor's mental condition, both before and after the execution of the deed, is relevant to show his mental condition at the time he executed the deed. *Estate of McKasson, supra.*

■ To the extent that the estate's argument on *its* burden of proving mental incapacity is preserved, the estate points to evidence that Willis was confused and disoriented at times and was "taking quite a cocktail of medications." According to Dr. Lane, the only way to determine Willis's lucidity at the time of the deed's execution was to interact with him. We note that Knight was the only witness, aside from Sally, who was present at the time Willis executed the deed and that the trial court found Knight to be "particularly credible." Knight testified that Willis called him by name, made meaningful inquires about Knight's family, and gave appropriate responses. Knight testified that he believed Willis signed the deed of his own volition. Maurice Seay, who visited with Willis every day, testified that Willis

was able to focus and that his mind "seemed clear" until Willis went into a coma. Likewise, Mark Seay, who visited a few days before Willis's death, testified that Willis's mind was "clear as a bell." In light of this evidence, we cannot say that the trial court clearly erred in determining that Willis possessed sufficient mental capacity to execute the deed.

When it is contended that a deed was obtained by duress or undue influence, the law requires that the proof be clear, cogent, and convincing before the deed can be set aside. *Thorn v. Pierson*, 2011 Ark. App. 206, 2011 WL 898677. Although the estate argues from the inaccurate standpoint that a presumption of undue influence arose, we nevertheless will address the estate's assertions regarding the perceived undue influence exerted by Sally. The estate contends that, during the last two weeks of Willis's life, Sally was in complete control of Willis. Sally signed a document at the hospital establishing herself as Willis's primary care person, and Willis was thereafter forced to depend on Sally for every need. The estate contends that Sally decided that no family members should be notified, which demonstrates that Sally attempted to isolate Willis from his family. The estate argues that Sally communicated Willis's needs to the hospice workers and that Sally declined assistance from volunteer care givers because she "just wanted it to be them," meaning Willis and Sally.

The hospice reports do not support the estate's assertion that Sally isolated Willis from his family. Virtually all of the witnesses at trial testified that Willis and his brother John Sr. did not get along and had no significant relationship for approximately twenty years, not because of Sally, but because their mother deeded the Hankins farm to Willis, effectively disinheriting John Sr. In the comments on risk potential in an initial psychosocial assessment dated March 10, 2007, a hospice worker wrote, "There are some problems in the family regarding a feud between the patient and his brother John. *They* don't want the patient's brother John to be given any information." (Emphasis added.) The hospice reports and trial testimony demonstrate that Willis was not isolated from any family members from whom he wished to have contact. John Jr. was listed on hospice reports as a care giver, and hospice was provided with Maurice Seay's telephone numbers. Family members, including John Jr., Maurice, Mark Seay, and Rudean Lester visited Willis while he was in hospice care. The fact that Sally cared for Willis, provided information regarding his treatment and care to hospice workers, and declined hospice's offer of volunteers does not prove undue influence. We cannot say that the trial court clearly erred in finding that the estate failed to prove that Willis was unduly influenced by Sally.

### B. Personal Check for $47,800

The estate argues that Sally converted over $49,000 of Willis's funds and that Knight and Bancorp South were negligent for not preventing Sally from doing so. Aside from the check for $47,800, the estate argues that Sally should be liable for an additional $1,455.49, representing three checks that were also deposited into Sally's account on the same day as the $47,800 check. The estate, however, failed to obtain a ruling with regard to the other three checks, and therefore we do not address the estate's argument. *Peoples Bank & Trust Co. of Van Buren v. Wallace*, 290 Ark. 589, 721 S.W.2d 659 (1986). We address only the argument with respect to the one check in the amount of $47,800.

In its post-trial brief, the estate argued that

the overwhelming number of inconsistencies in Austin's testimony, along with the gross lack [of] evidence and witnesses to support her testimony, clearly call to question the credibility of her testimony, and therefore, the court should discount her testimony as nothing more than pretext to hide her wrongful acts. In the alternative, the court should find that a confidential relationship existed between Willis Hankins and Sally Austin, and that Austin's procurement of the check from Willis was the result of undue influence, pursuant to which the court should find that Austin had no authority to cause the funds therefrom to be deposited into her own bank account.

 Although the estate argued confidential relationship, procurement, mental incapacity, and undue influence below, the estate did not obtain a ruling on these matters *with respect to the check*. As such, these matters are not preserved for our review. *Peoples Bank, supra*. The trial court issued its ruling based on credibility and authority.

 On appeal, the estate argues that, although Sally testified in great detail regarding the instructions given to her by Willis, no one else was present during the exchange, and Sally was not a credible witness. Where the pivotal issue is the credibility of interested parties whose testimony is in direct conflict, we defer to the trial judge's determination. *Carpenter v. Layne*, 2010 Ark. App. 364, 374 S.W.3d 871. Despite any perceived inconsistencies in Sally's testimony, the trial court apparently believed Sally's testimony, and this court is bound by such determinations. *Id.* The trial court concluded that Sally had authority from Willis to complete the check, given Sally's testimony as to Willis's instructions, the fact that the amount of the completed check was near the exact amount needed to transfer Willis's entire account balance to Sally, and the fact that Willis and Sally shared a close, long-term relationship. The check thus did not qualify as an altered instrument, which involves an unauthorized change. Ark.Code Ann. § 4–3–407(a) (Repl.2001). Rather, the check was an incomplete instrument. An "incomplete instrument" means a signed writing, whether or not issued by the signer, the contents of which show at the time of signing that it is incomplete but that the signer intended it to be completed by the addition of words or numbers. Ark.Code Ann. § 4–3–115(a) (Repl. 2001). The burden of establishing that words or numbers were added to an incomplete instrument without authority of the signer is on the person asserting the lack of authority. Ark.Code Ann. § 4–3–115(d). Given the credibility determination, we hold that the trial court did not clearly err in determining that Sally had authority to complete the check in the manner that she did.

 The estate argues that Knight's failure to verify information and protect Willis from financial damages was not commercially reasonable. Willis gave Sally authority to complete the check, and Sally communicated that authority to Knight, who completed the check in accordance with Sally's instructions, which reflected Willis's intent. We cannot say that the trial court clearly erred in reaching the conclusion that Knight completed the check pursuant to Willis's authority. In any event, the estate does not explain how Knight and Bancorp South had a duty to

protect Willis, who was not a customer.[2]

Affirmed.

VAUGHT, C.J., and GLOVER, J., agree.

**2.** The law of negligence requires as an essential element that the plaintiff show that a duty of care was owed. *Yanmar Co., Ltd. v. Slater,* 2012 Ark. 36, 386 S.W.3d 439.