

# ARKANSAS COURT OF APPEALS

DIVISION IV

No. CV–16–206

|  |  |
|---|---|
| JOANNE BERNADETTE BLACK, CHARLES AARON BLACK, CLAY BLACK, TRAVIS STEPHEN BLACK, AND YANCEY REYNOLDS<br>APPELLANTS | **OPINION DELIVERED:** DECEMBER 7, 2016<br><br>APPEAL FROM THE HEMPSTEAD COUNTY CIRCUIT COURT<br>[NO. 29CV-13-187-1] |
| V. | HONORABLE RANDY WRIGHT, JUDGE |
| JACK NORWOOD DUFFIE, JR., AS GUARDIAN OF THE ESTATE OF ELLEN ANNABELLE DUFFIE<br>APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Chief Judge

Joanne B. and Charles Black, their children, Clay and Travis Black, and Yancey Reynolds appeal the Hempstead County Circuit Court's November 18 and 30, 2015 orders that found null and void a deed transferring an interest in 180 acres and the transfer of a share in the Hempstead County Hunting Club (Grassy Lake) and ordered judgment against appellants Joanne and Charles in the amount of $52,605.56. Appellants also appeal the circuit court's January 6, 2016 order awarding attorney's fees in the amount of $31,069.36 to appellee Jack Duffie, Jr., as guardian of the estate of Ellen Annabelle Duffie (Annabelle). Appellants argue four points on appeal: (1) the circuit court erred in declaring null and void the transfer of the Grassy Lake share; (2) the claims regarding the Grassy Lake share were barred by the statute of limitations; (3) the circuit court erred in declaring null and void the

 

deed for 180 acres to Joanne and Charles Black; and (4) the circuit court erred in awarding attorney's fees to appellee.[1]  We affirm.

## I. *Facts*

Annabelle, born May 16, 1938, and her adult brother, Jerome Duffie, resided together during Annabelle's entire adult life until Jerome's death. Annabelle never married. Jerome took care of Annabelle's finances until he died on April 4, 2006, leaving Annabelle his property, which included a three-quarter interest in 180 acres located near Hope, Arkansas, and a share of stock, along with a cabin, in Grassy Lake.  Appellee, Annabelle's nephew, was appointed guardian of the person and estate of Annabelle on June 17, 2013.

Appellee filed a complaint alleging that on June 21, 2006, less than three months after Jerome's death, Annabelle transferred her share in Grassy Lake to appellants without consideration and that appellants had intentionally misrepresented to her that she would retain ownership in Grassy Lake and would be giving them only hunting and fishing privileges.  It alleged that Annabelle had not been told that, by giving up her share of stock, she would forfeit her right to continue using the hunting club and living in the cabin.  It was alleged that, after the stock had been transferred, appellants moved Annabelle from Grassy Lake to a "run down, substandard housing unit."

The complaint described that Annabelle executed a warranty deed with vendor's lien on August 20, 2009, granting her interest in the 180-acre tract to appellants Joanne and

---

[1]We address appellants' arguments by combining the issues contained within their arguments related to the transfers of the share and deed under three headings: (III) Undue Influence and Competency; (IV) Consideration; and (V) Judgment for Cut Timber and Rescission.

Charles. It was alleged that Joanne and Charles intentionally misrepresented the value of the tract, that the tract was transferred for a payoff to Annabelle of $150,000, and that the land was worth $400,000 or more. Also, Annabelle financed the sale of the property, only receiving monthly payments of $1000, while the Blacks maintained possession and use of the land, having sold the timber in June 2012.

Appellee alleged in the complaint that any statutes of limitation were tolled because Annabelle had been mentally incompetent, citing Arkansas Code Annotated section 16-56-116 (Repl. 2005). He alleged that the transfers of the 180-acre tract and the share in Grassy Lake should be declared void for failure of a contract because Annabelle, having been incompetent her entire life, had been incapable of entering into a valid and binding contract, no consideration had been paid for the hunting club stock, and there had been no mutual agreement due to undue influence, duress, and fraud. Appellee also alleged the conversion of timber cut from the 180-acre tract and sought rescission of the contracts, an accounting, damages, punitive damages, and attorney's fees. Appellants answered, generally denying the complaint, and pled all applicable statutory limitations, waiver, estoppel, laches, and unclean hands.[2]

At the bench trial held November 9 and 10, 2015, Betty J. Feir, a licensed psychologist, testified that she had conducted a psychological evaluation of Annabelle and had made a report in January 2013. She said that Annabelle was "functioning retarded" at

---

[2] Appellee's first amended complaint added Reynolds as a defendant and alleged that, after appellees took possession of it, Reynolds paid for substantial improvements to the cabin at Grassy Lake in the amount of $78,519.24. Appellee's second amended complaint added Clay as a defendant.

that time and that her IQ score was 59, which Feir considered to be mild mental retardation. She said that a person of Annabelle's intelligence would be incapable of determining the value of her assets or making financial decisions without assistance. Feir explained that an IQ of 100 is average and that 70 is considered borderline retarded. Feir said that Annabelle's mental retardation did not begin in January 2013, but had occurred over a period of years, and that a person functioning with a 59 IQ would not be able to make decisions that were logical and relevant. Feir's impression was that Annabelle was not able to say "no" when it was needed for her well-being because she appeared to want to please people. It was Feir's opinion that Annabelle would be vulnerable in a business transaction. Feir said that Annabelle did not have the necessary intellectual or cognitive functioning at "this point in her life," or even earlier, because the decline had been gradual, and Annabelle had the beginning of dementia.

James Burton Clem testified that he is a real-estate broker and is licensed in Texas and Arkansas. He gave his opinion that the total value of the 180-acre tract was $425,000, and in addition, the timber on the land was worth $177,000. In making his analysis, Clem testified that he had reviewed an expert report prepared by Jeff Neill, who had valued the land at $300,000, which included the timber value. He believed that Neill had not included what Clem considered to be the commercial value of the "front 40 acres."

Appellee testified that he thought Annabelle was too trusting of people. He said that Annabelle had never married and had never worked. He said that Jerome had bought her a building that had school supplies in it, known as the School Box, and she had spent time there. Neither Jerome nor Annabelle had depended on income from it for their livelihood.

He said that Annabelle was living at the Grassy Lake cabin at the time of Jerome's death, but within a month or two, Annabelle moved. In 2009, Annabelle deeded the 180-acre tract to Joanne and Charles and signed a warranty deed with vendor's lien retained transferring her ownership to them. At the time of the transfer, Annabelle owned a three-quarter interest in the property, and her sister Patricia Holloman owned one-fourth. He testified that it was his understanding that Reynolds had helped to negotiate a price of $150,000 for Annabelle's interest, with $1000 monthly payments to Annabelle. He said that Annabelle was supposed to receive 5 percent interest under the transaction, but she had not been receiving anything but a flat $1000 payment with no interest. He also said that the Blacks had not given Annabelle a down payment. He testified that some timber had been cut off the property and sold for $58,886.73 and $11,254.01. He asked that the contract for the sale of the 180 acres be nullified, for all amounts paid to Annabelle be declared rents for use and possession of the property, and for a judgment doubling the amount for which the timber had sold. He also asked that the share in Grassy Lake be returned to Annabelle because she had not been paid any money for it. He asked that any improvements made to the cabin by Reynolds be retained by Annabelle in exchange for the Blacks' use and possession of it.

Joanne testified that her son Clay had called her one afternoon after bush hogging on the 180 acres for Annabelle. Clay told Joanne that a man said that Annabelle had given him permission to look at the property because he was thinking about buying it. Joanne said she left work early, went to the School Box, asked Annabelle if she planned to sell the 180 acres, and "she didn't answer me." When Joanne told her that she would like an

opportunity to buy it, Annabelle did not "make any comment one way or another," and Joanne went home. Joanne said that she then asked Reynolds to negotiate a sales price on the property because he was knowledgeable in timberland sales, property sales, and large tracts of land because he sold timberland tracts for a living. Joanne said that she was Reynolds's personal secretary and bookkeeper and that she held a real-estate license in Arkansas. She said that she had never sold any timberland when she had been active in real estate, and she never had a discussion with Annabelle about the price of the land before Reynolds became involved. She also said that Annabelle knew what the property was worth because Annabelle "had an appraisal when Jerome died."

Joanne said that she bought Annabelle's three-quarter interest for $150,000. She testified that she had never obtained a bank loan to purchase the property "because I thought maybe [Annabelle] could finance it and by financing it she could make interest on her money, on the property, at 5 percent interest on me instead of the bank making interest on me. She liked that idea." Joanne said that she did not provide Annabelle with an amortization schedule, and she did not know how much she had paid on the principal amount. She said that she had sold timber off the property on two occasions for a little over $70,000, and that she had used that money to purchase Patricia's one-fourth interest for $45,000. She had obtained a bank loan for that purchase, but when she got the money for the timber sale, she applied some "plus the interest on that." She said that she and her husband do not live on the property but that her family hunted on the land during deer season.

She said that at some point in 2006, her sons, Clay and Travis, gained ownership of the share of stock at Grassy Lake and the cabin located there. "We did not pay anything for that share of stock, to my knowledge," she said. She acknowledged that Jerome did not leave her anything in his Will. She said that the improvements made to the cabin could be valued at $70,000 and that Reynolds paid for those "because he wanted to. He told me he wanted to do it for the boys and me." She said that she had worked for Reynolds for a long time and that he had paid for the improvements because of their friendship. She said that her boys pay the dues at Grassy Lake, and she did not know how much a share of stock was worth.

Joanne testified that when Jerome had been sick before his death, she had applied for guardianship over him. She admitted that she could have characterized Annabelle as having limited business experience and having limitations that would prevent her from being Jerome's guardian. She read from her petition filed in Jerome's guardianship proceeding and acknowledged that Jerome had taken care of business affairs for himself and his sister and that Annabelle was described therein as being "limited and unable to serve" as guardian over Jerome. Joanne admitted that it was three years later that she had offered Annabelle $150,000 for her interest in the 180 acres and that Annabelle did not have representation during the negotiation. She said that she had felt that Annabelle could not serve as guardian of Jerome at the time because she was distraught because of her brother, but that Annabelle had insisted to her shortly thereafter that she was quite capable. She said she had not seen Annabelle since 2011 because she had received a letter from a Hot Springs attorney telling

her not to have any more contact with Annabelle. The Hot Springs attorney had handled the sale of the mobile-home park owned by Annabelle after Jerome's death.

Joanne described her family's relationship with Annabelle and Jerome as close and loving. She said that Jerome had taught the boys to shoot and had taken them for weekends with him and Annabelle at Grassy Lake "all the years they were growing up." She said Annabelle got mad at her when she had told Annabelle "it's either those people or me," referring to Robert Bonnette and Marilyn McRoy, who had bought the mobile-home park from Annabelle. Joanne said that when Annabelle "chose them," she left Annabelle alone and then shortly thereafter she had received the letter from the Hot Springs attorney. Joanne said that she thought Annabelle had been afraid that if she "didn't stay with those folks that they were going to somehow get her out of there." She also testified that Jerome had asked her and her husband to "keep an eye on Annabelle while he was in the hospital, which meant getting her to town from the hunting club cabin to her shop every day and back to the cabin. One of us would stay with her." She said that she had been Annabelle's friend for over twenty years.

Reynolds testified that he had become involved in negotiating the sales price between Joanne and Annabelle in 2009 after he had an update of the property appraisal. He had discussed the price with Annabelle when she had come to his office in 2009, and he said Bill Cason, Annabelle's confidant, had been with her. He testified that Annabelle had answered "yes" when asked if she wanted to sell her property. He said that Joanne offered Annabelle $150,000 for the property and, following that discussion, he had "immediately" sent Annabelle and Cason to Mr. Pilkington's office (an attorney). Reynolds testified that

he assumed Annabelle had consulted with Cason about the sales price, as Cason had heard the entire discussion. He said that no other figure than $150,000 had been discussed, and Annabelle had been told that she would be paid on an installment, with 5 percent interest, for fifteen years, when a balloon payment would become due. Reynolds also testified that he had spent $75,000 on improvements at the Grassy Lake cabin, and he had done so because he had regard for Joanne and her family. He said that he had no ownership interest in that cabin and that he was a member of Grassy Lake, had a cabin there, and was on the board of directors. When first asked, he said that he was not at liberty to say how much shares of Grassy Lake stock were worth, but he later said that he had no idea for what the recent share had sold.

Annabelle testified that she did not remember when she had sold her land to Joanne and Charles, and she did not remember having gone to Reynolds's office. She later said that she seemed to remember going to Reynolds's office and that it seemed like she remembered she was offered $150,000, which sounded like a lot of money to her. She said that she had not done any investigation to determine what her property was worth, she had been receiving $1000 per month, and she hoped it would continue. She also testified that she did not remember when she had transferred her share of Grassy Lake to Travis and Clay. She said that she did not know why she had done it, and she did not know at the time why she was doing it. She said that no one told her it was what Jerome had wished, she did not think she could stay in the cabin after the transfer, and she did not remember how long she had stayed there after the transfer. She said that she thought Clay or Travis had told her she must move out of the cabin. Annabelle later testified that she recalled the 2009 deed transfer

to Joanne and Charles, as well as other transactions that occurred regarding other properties she had sold since that time.

Clay testified that he owned half of the share in Grassy Lake with his brother Travis, and neither of them paid Annabelle for it. He testified that he spent considerable time hunting with Jerome at Grassy Lake and that Annabelle had told him that she gave them the stock because Jerome had wanted it like that. He said that he had been living with Annabelle at Grassy Lake after the stock transferred and that he had told Annabelle before the transfer that "somebody is going to make a statement and let us know we can't stay up here anymore. Otherwise, it's going to come down on Travis. It's no reflection on me because I'm not the active member. Travis is held accountable." He said that in 2008,

> [w]e took her and Bill over to the duplex which she owned. She owned a couple of trailers out there and the duplex . . . She appeared to be very happy there and at the same time she was able to take care of her day-to-day operations. . . . Once she got to the duplex, I don't know who took care of paying the utilities.

He said that Annabelle took care of herself during the time he had lived with her and that when Jerome had been alive, Jerome would hand her money and tell her to get what they needed for that night, and she would keep what was left over. He said that when Bill, her boyfriend, became ill and could not drive, Annabelle had to rely on others for transportation and "stuff."

Travis testified that he and his brother had split the share of stock at Grassy Lake, there was only one membership per share, and he utilized the membership from that stock. He testified that Jerome had been like a grandfather to him and his brother and that some people at Grassy Lake thought he was related to Jerome. After the Grassy Lake board had met in the fall of 2008, Travis told Clay something must be done with his and Annabelle's

living situation because to continue to live at the cabin was "illegal." He said that if the rules of Grassy Lake were broken, members were suspended or expelled and never allowed back on the property. He said that he had never told Annabelle she could not "come and hang out at the cabin," and that she was welcome so long as he was there. He said that he did not feel like he had taken advantage of Annabelle and that he loved her. Travis testified that he had a copy of a letter that Jerome had left with his Will, which he found when Jerome's brother apparently had left it with the Will at the cabin. The letter was introduced as an exhibit, and it is a handwritten list of Jerome's assets and states in a parenthetical, "Annabelle, it is my wish that you put in your will to let Clay and Travis Black get the share [in Grassy Lake] when you die." Travis also testified,

> She has not ever asked me to transfer the share of stock back to her. If she did, I would discuss it with her and if she felt that's what was best then I'd probably talk to my brother because I can't make decisions without him but I would probably say it wouldn't be a good idea because I'd lose my membership and then nobody would be allowed on the property.

Charles Black testified that his family had been friends with Jerome and Annabelle for years, and he had never thought there was anything wrong with Annabelle, that Annabelle took care of herself and had a business, that she knew how to make a dollar, and, when it was needed, she would call on him. He said his wife had negotiated the purchase of the 180-acre tract and that, after they had received the letter from the attorney in Hot Springs, he had not bothered Annabelle anymore.

Damon Young testified that he had been the president of the Grassy Lake board of directors at the time of the stock transfer to Travis and Clay. He said Reynolds had contacted him about the transfer and had delivered transfer paperwork to his office in June

2006. Young said that Travis and Clay had received a stock certificate dated June 21, 2006, for one share and that the membership committee had approved Travis's application for membership. He did not know if Annabelle had been paid for the share, and although Annabelle had signed the documents to transfer, this had not been done in his presence. He said that he did not know for how much the most recent shares of stock had sold, but he did know that one had sold for $400,000 when he was serving as president. He said that he had not been personally aware since that time of any other shares selling for more than that. Young said that when the transfer took place, it had been his understanding that Jerome had willed his share to Travis and Clay.

Bobby Kesterson testified that he was a real-estate appraiser living in Hope, Arkansas, and he had valued the 180-acre tract at $750 per acre, considering the property as if the timber had been harvested and it was bare land. His appraisal was that the land was worth $139,000, not including the value of the merchantable timber.

The circuit court filed an order on November 18, 2016, finding that, when the evidence and testimony were taken as a whole, it was clear and convincing that Joanne and Reynolds had taken undue advantage of their relationship with Jerome and Annabelle, and they had systematically taken control of manipulating the assets given to Annabelle so that they could benefit from those assets, including a less-than-market-value price for the real estate and no value paid for a share of stock in Grassy Lake, worth at least $400,000 plus improvements. As a result of this influence, Clay and Travis had become owners of said stock and improvements and were the beneficiaries of the actions of Joanne and Reynolds. The order states,

At a time in the life of an aging individual who needed the sound advice and counsel of trusted individuals Annabelle Duffie received advice and counsel from those bent on taking advantage of her. The law is to protect individuals such as Annabelle Duffie and the law is not a tool for those who wish to use it as their means of depriving others of their property rights.

The circuit court found the transfer of the three-quarter interest to Joanne and Charles to be null and void for lack of adequate consideration and due to the undue influence on Annabelle by the Blacks, which made her unable to competently enter into the transaction. Further, the circuit court voided the transfer of the share of Grassy Lake, finding that it lacked any consideration and that due to the undue influence placed on her by the Blacks, she did not understand what she was signing when she was presented with the documents for transfer of said share. The circuit court ordered the Blacks to execute a deed to Annabelle transferring the 180 acres back to her, notify Grassy Lake of the circuit court's ruling, and transfer the stock back to Annabelle. Further, the circuit court awarded appellee judgment against Joanne and Charles in the amount of $70,140.74 for the timber that was cut and ordered the attorney for appellee to submit an affidavit in support of attorney's fees and expenses for the circuit court to consider.

On November 25, 2015, appellants filed a motion to amend under Arkansas Rule of Civil Procedure 52 (2015) and/or for a new trial under Arkansas Rule of Civil Procedure 59. Appellants asserted their defense of limitations on actions and claimed that Annabelle was not found to be incompetent until January 2013, which was six years after the transfer of the share in Grassy Lake. Therefore, they claimed that the statute of limitations had run on that claim prior to her having been deemed incompetent. Appellants asked the circuit court to amend its order to reflect that they convey Annabelle's three-quarter interest in the

180 acres, rather than the entire 180 acres. Further, they asked that the judgment amount for the sold timber be reduced to a three-quarter interest as well. Appellants asked that the circuit court find that appellee did not meet his burden of proof of clear and convincing and that his complaint be dismissed. They also asked for fees and costs.

On November 30, 2015, the circuit court amended its November 18 order to reflect that Joanne and Charles should execute a deed conveying to Annabelle a three-quarter interest in the 180.85 acres and amended the judgment for the timber cut to $52,605.56. The circuit court denied any further relief. On January 6, 2016, the circuit court ordered that appellants were jointly and severally liable for $31,069.36 in attorney's fees. The order reflects that appellee's counsel had submitted an affidavit for fees and costs. After timely notices of appeal were filed, this appeal followed.

## II. *Standard of Review and Applicable Law*

This court has stated that

> [w]e review traditional equity cases de novo. The test on review is a clearly erroneous standard (*i.e.*, whether we can say that the trial court's findings are clearly erroneous). *Berry v. Walker*, 2012 Ark. App. 16. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake was made. *Id.* In reviewing a trial court's findings of fact, we give due deference to the trial judge's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Munzner v. Kushner*, 2010 Ark. App. 196, 375 S.W.3d 647.

*Hughes v. Dalton*, 2013 Ark. App. 142, at 4. This court has also held that where the pivotal issue is the credibility of interested parties whose testimony is in direct conflict, we defer to the trial court's determination. *Hankins v. Austin*, 2012 Ark. App. 641, at 13, 425 S.W.3d 8, 16.

III.  *Undue Influence and Competency*

Appellants contend that the circuit court erred in declaring null and void the 2006 transfer of the Grassy Lake share and the 2009 deed transferring Annabelle's interest in the 180-acre tract and argue that there was no undue influence and that Annabelle was not incompetent. We consider appellants' arguments regarding undue influence and Annabelle's competency together.  *See Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997) (Questions of undue influence and mental capacity are so closely interwoven that they are sometimes considered together.).  We note that

> [i]t is generally recognized that, in order to invalidate a contract on the ground of undue influence, a party must be deprived of his free will. *Dent v. Wright*, 322 Ark. 256, 909 S.W.2d 302 (1995). The questions of undue influence and mental capacity are so closely interwoven that they can be considered together. *See Noland v. Noland*, *supra*. The influence that the law condemns is not the legitimate influence that springs from natural affection, but the malign influence that results from fear, coercion, or any other cause that deprives the individual of his free agency. *Id.* Undue influence may be inferred from the facts and circumstances of a case. *Looney v. Estate of Wade*, 310 Ark. 708, 839 S.W.2d 531 (1992).

*Hooten v. Jensen*, 94 Ark. App. 130, 136, 227 S.W.3d 431, 435 (2006).

This court recently addressed the issue of mental capacity to execute a deed as follows:

> The determination of whether a deed is void because of the mental incapacity of the grantor is measured by his or her mental ability at the time of the execution of the deed. *Munzner v. Kushner*, 2010 Ark. App. 196, at 6, 375 S.W.3d 647, 651 (citing *Andres v. Andres*, 1 Ark. App. 75, 83, 613 S.W.2d 404, 409 (1981)).  If the grantor is mentally competent at the time he executes the deed at issue, the deed is valid. *Id.* The test of mental competency to execute a deed was set forth by our supreme court in *Donaldson v. Johnson*, 235 Ark. 348, 359 S.W.2d 810 (1962), as follows:
>
>> If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it,  and

to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, *in the absence of fraud, duress, or undue influence*, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him.

*Id.* at 352, 359 S.W.2d at 813 (citations omitted). The mental capacity of the maker of a trust or deed is presumed, and the burden rests on the contestants to prove incapacity by a preponderance of the evidence. *Munzner, supra* (citing *Rose v. Dunn*, 284 Ark. 42, 46, 679 S.W.2d 180, 183 (1984)).

*Marston v. Taylor*, 2015 Ark. App. 176, at 4–5, 457 S.W.3d 688, 691 (emphasis added).

Appellants argue that appellee did not meet his burden of proof because there was no false representation made to Annabelle to induce the 2006 stock transfer, there was no evidence that Travis or Clay exerted any fraud or undue influence on her to obtain the stock, and the record is devoid of evidence of fraud, fear, or coercion to induce Annabelle to execute the 2009 deed. Appellants maintain that Travis and Clay were not strangers to Jerome and Annabelle and that Jerome treated them as a grandfather would. Appellants assert that there was ample evidence that the Blacks were close family friends of Jerome and Annabelle and there was no evidence of any malign influence on Annabelle by any appellant.

They point to the evidence that their relationship spanned over twenty years; they spent holidays and birthdays with Jerome and Annabelle; Jerome taught Travis and Clay how to shoot their guns and spent weekends with them at Grassy Lake; and until the boys left for college, they attended church with Jerome and Annabelle. Appellants admit that Annabelle testified that she did not know why she made the transfer of stock to Travis and Clay in 2006 and that she did not receive money for it. Appellants point to Clay's testimony that Annabelle told him that she gave them the stock as a gift because that is what Jerome

16

had wanted. Further, Travis and Clay testified that Annabelle never expressed to them that she wanted the stock back. They contend that Annabelle's testimony—that no one told her that it was Jerome's wish for the boys to have the stock—belies appellee's theory that Annabelle was defrauded by false promises with respect to the stock. Also, appellants claim that Annabelle understood that she could not continue to live at the cabin following the transfer. Appellants emphasize that Travis and Clay allowed Annabelle to continue to live at the cabin with Clay until 2008 when they had to move due to the club rules.

Appellants contend that Joanne offered to purchase Annabelle's interest in the 180 acres for $150,000, and Joanne testified that Annabelle "liked that idea," which is consistent with Annabelle's testimony that she hoped she would continue to receive monthly payments. Annabelle testified that she thought there had been an appraisal done of the 180 acres by Jeff Neill in 2006. Reynolds testified that the purchase price was based on an update of Neill's appraisal, and Reynolds said that the purchase price was discounted because Annabelle possessed only a partial interest in the property. Reynolds said that he met with Annabelle and Bill Cason regarding the offer to purchase and advised Annabelle that the price would be paid in installments. Annabelle accepted the offer and subsequently executed a written acknowledgment of such. Appellants also point to the fact that Joanne and Charles acquired the remaining quarter interest in the property from Broadway Bank, trustee of the Hollomon Living Trust, for $45,000.[3]

---

[3]The one-fourth interest in the 180-acre tract was owned previously by Patricia Holloman, Jerome's and Annabelle's sister.

Appellants argue that the law condemns malign influence due to fear or coercion, not legitimate influence resulting from natural affections. *Hooten*, *supra*. They point to Jerome's letter to Annabelle and insist that the transfer of stock to Clay and Travis was consistent with Jerome's express wishes. *See Petree v. Petree*, 211 Ark. 654, 201 S.W.2d 1009 (1947) (where part of the evidence considered in upholding a contract was a decedent's letter expressing wishes that were fulfilled under the contract). Appellants admit that at trial, nearly nine-and-a-half years after the transfer, Annabelle could not recall why she had made the transfer. However, they contend that she offered no testimony that Travis, Clay, or any other appellant had pressured her into making the transfer or had otherwise fraudulently induced the transfer.

Appellants insist that the timing is important in relation to the 2009 deed transfer because Annabelle had waited three years to sell Joanne and Charles the property. Further, appellants contend that the transaction was not unique or irregular; rather, it was one in a series of conveyances by which Annabelle disposed of property she had inherited from Jerome. They point to six transactions made by Annabelle between 2009 and 2012, which included her sale of four lots, a mobile-home park, and the School Box. Appellants assert that a property owner who is competent may dispose of property as he or she sees fit. *Rose*, *supra*. They argue that there is no evidence that any appellant exerted any fraud or undue influence on Annabelle to obtain her property, and the circuit court should be reversed.

Appellants also contend that the law presumes that Annabelle had the capacity to make the 2006 transfer. Appellants argue that the relevant time for determination of mental capacity is the time the will or deed is executed or, in this case, the time the stock transfer

was made—June 2006. They argue that Jack was not appointed guardian of Annabelle until June 2013, and the testimony of Dr. Feir, who evaluated Annabelle in 2013, contradicts appellee's allegation that Annabelle had been incompetent her entire life. They emphasize Dr. Feir's testimony that Annabelle's IQ of 59 was due to a cognitive decline and that Annabelle presented as a person with an IQ of 80. Further, they assert that Dr. Feir did not testify that Annabelle was incompetent at the time of the stock transfer in 2006. Appellants contend that Dr. Feir's testimony was not conclusive, but must be considered with all other evidence bearing on the issue of competency. They cite *Reed v. Radebaugh*, 8 Ark. App. 78, 648 S.W.2d 816 (1983), where this court stated that the law presumes every person is sane, fully competent, and capable of understanding the nature and effect of his contracts.

Appellants assert that Joanne testified that Annabelle had taken care of her business and property interests following Jerome's death in 2006. Further, Annabelle had served as executrix of Jerome's estate. Following the stock transfer in 2006, Annabelle had lived with Clay at Grassy Lake until 2008. Clay testified that Annabelle had been in control of her own money and did with it what she wanted, that she cooked for herself, took her medications on time, and was a bargain shopper. When she moved out of the cabin, she moved to a duplex she had inherited from Jerome and lived there with her partner Bill Cason. Appellants also point to Annabelle's testimony recalling the members of her family, including her parents' names, their years of death, and her dead siblings' names and places of residence. Annabelle recalled working at Jerome's hardware store and the School Box and the sale of the School Box. She testified that she did her own banking and recalled the name of her bank teller. She said that she presently lived at Hope Haven Assisted Living

19

Center because she had fallen and could no longer live on her own. She recalled the sale of her interest in the 180 acres to the Blacks and said that she had received $1000 per month and hoped to continue to do so. Appellants emphasize that Annabelle wrote to Joanne after she had moved to Hope Haven to advise Joanne where to send the monthly payments. Finally, Annabelle testified to several conveyances from her to others not parties to this case spanning from 2009 through 2012.

Appellants argue that appellee's testimony, that it would have been Annabelle's decision what to do with the money had she received $150,000 at the time of the sale of her interest in the 180-acre tract, belies his assertion that Annabelle was incompetent. They claim that appellee offered no testimony of Annabelle's incompetence in 2006, 2009, or any other material time prior to 2013. Appellants argue that, even though it may have been eccentric for Annabelle to live with her brother and work at the School Box, these things do not add up to incompetency under the law. They argue that Annabelle recalled the extent of her property, including what was owned at Jerome's death, how she disposed of it, and to whom, and generally upon what consideration, and appellants claim that the law's requirements were met. *See Marston, supra.* Appellants contend that Annabelle's cognitive decline does not compel a finding that she lacked capacity to execute the 2006 stock transfer.

Appellants also contend that Annabelle was competent when she made the 2009 deed, and it was appellee's burden to prove otherwise. *See Noland, supra.* They argue that appellee offered evidence that Annabelle was incompetent in 2013, but not in 2009, making the same argument made in relation to the 2006 transfer and pointing to Dr. Feir's testimony. Appellants contend that Annabelle's testimony contradicts a finding of incapacity

in 2009, as she testified to the details of her family, her property, and the disposal of her property. They further contend that it is speculation that Annabelle was incompetent in August 2009, and that speculation cannot overcome the presumption in the law that Annabelle had the mental capacity to execute the deed. *See Petree*, *supra* (no expert testimony of incapacity at time of contract); *Pledger*, *supra* (experts opining on incapacity not acquainted with the grantor until years after execution of deeds).

Appellee argues that Annabelle was incompetent and that there was ample evidence of her mental incapacity. We agree with his contention. Appellate courts defer to the superior position of the trial court to weigh the credibility of the witnesses and to resolve conflicts in witness testimony. *See Hankins*, *supra*.

Annabelle was unable to recall when the property had been conveyed to Joanne and Charles, and she had difficulty recalling being present in Reynolds's office during the negotiations to sell the property. Annabelle also exhibited a complete inability to comprehend the financial ramifications of the sale, expressing her belief that getting $10,000 was better than receiving $150,000. Joanne testified regarding her petition for appointment as Jerome's guardian and her contention in 2006 that Annabelle could not serve as Jerome's guardian because she had limited business experience and intelligence. Within two months of Jerome's death, Annabelle transferred the stock in Grassy Lake to Clay and Travis. Reynolds initiated the discussions regarding the transfer of the stock share, Reynolds was Joanne's employer for nearly thirty years, and both were in the real-estate business. Further, Reynolds was a stockholder in Grassy Lake and was on the board of directors at the time of Jerome's death and subsequent transfer of his stock to Clay and Travis. Damon Young,

then-president of the hunting club, testified that he had never spoken to Annabelle about the transfer, Reynolds had initiated the discussion about the transfer in early June 2006, and his impression was that Jerome had left the stock share to Clay and Travis in his Will. Joanne testified that she did not know why the stock was transferred to her sons, but later stated that it was Jerome's wish. Jerome's note states that Annabelle was to leave the stock to Clay and Travis when she died, not during her lifetime. Reynolds testified that he could not say how much the share was worth, and later said that he did not know its worth. Young testified that the last stock sold for $400,000.

Testimony revealed that appellants were very close to Annabelle prior to and after Jerome's death. However, after acquiring the share in Grassy Lake without payment, purchasing the real estate with owner financing, and moving Annabelle out of the cabin, appellants and Annabelle became estranged. Appellants testified that they had known and taken care of Annabelle for many years and knew that someone had always taken care of her. After her brother's death, members of the Black family stayed with Annabelle. Annabelle was dependent on others, including the Blacks, for her transportation needs. The circuit court's order sets out the relevant findings, and, in weighing the evidence and the credibility of the witnesses, it concluded that appellants had taken undue advantage of their relationship with Jerome and Annabelle and that they had systematically taken control of manipulating the assets given to Annabelle. As a result, appellants had obtained the share in Grassy Lake without any consideration.

We hold that the circuit court's decision that Annabelle "did not understand what she was signing when presented with the documents for transfer of [the] share" was not

clearly erroneous.  Appellee cites *Watson v. Alford*, 255 Ark. 911, 503 S.W.2d 897 (1974),

where the Arkansas Supreme Court set forth the rule as follows:

> In the oft cited case of *Kelly's Heirs v. McGuire*, 15 Ark. 555 (1855), the court announced that if one is 'of such great weakness of mind, as to be unable to guard himself against imposition, or to resist importunity or undue influence, a contract, made by him under such circumstances, will be set aside. And it is not material from what cause such weakness arises. It may be from temporary illness, general mental imbecility . . . the infirmity of extreme old age.' The fact that a grantor is old and in feeble health is a circumstance bearing on the question of mental capacity as is gross inadequacy of price. *Campbell v. Lux*, 146 Ark. 397, 225 S.W. 653 (1920), *McEvoy v. Tucker*, 115 Ark. 430, 171 S.W. 888 (1914). Of course, we will not set aside contracts for mere inadequacy of price. *Hawkins v. Randolph*, 149 Ark. 124, 231 S.W. 556 (1921). The grantor's disability must render him incapable of 'intelligently comprehending and acting upon the business affairs out of which the conveyance grew, and to prevent him from understanding the nature and consequences of his act.' *McEvoy v. Tucker*, *supra*. Each case dealing with mental capacity must be decided on its own peculiar facts and circumstances. *Hawkins v. Randolph*, *supra*.

*Id.* at 912–13, 503 S.W.2d at 898.

Dr. Feir believed that Annabelle could not make appropriate financial decisions, and

she thought Annabelle was not able to say "no" when it was needed for her well-being

because she needed to please others.  Dr. Feir stated that, with an IQ of 59, Annabelle could

not make decisions that were logical or relevant.  Addressing appellants' contention that Dr.

Feir did not testify that Annabelle was incompetent at the time of the 2006 and 2009

transfers, we note that under *Noland*, *supra*, proof of a grantor's mental condition may be

taken both before and after a conveyance as being relevant to determining her condition at

the time of the conveyance.  Dr. Feir's evaluation was conducted in January 2013, and her

findings were relevant because she concluded that Annabelle had never reached a level of

average intelligence during her adult years, and her cognitive decline had been gradual and

would have occurred over a period of, potentially, more than six years before Dr. Feir's evaluation. This period of decline encompasses the times when both conveyances occurred.

Joanne testified that she considered Annabelle to be "limited" in 2006 when Joanne petitioned to be appointed Jerome's guardian. In making that application, a few months prior to the June 2006 transfer, Joanne made representations that Annabelle was an inappropriate guardian for her brother because she had limited business experience and intelligence. The fact that Annabelle had always lived with her brother and that he had cared for her is evidence reflective of Annabelle's mental capacity at the time of both transfers. Prior to his hospitalization, Jerome requested that Joanne watch over Annabelle, and during his hospitalization and in the years following Jerome's death, members of the Black family stayed with, and lived in the same home with, Annabelle. When it was discovered that Jerome had designated Annabelle as the executrix of his Will, Annabelle's siblings objected to her serving due to her incompetency.

The circuit court, in its superior position to judge witness credibility and resolve disputed facts, found that appellants had exerted undue influence over Annabelle in the conveyance of the 180-acre tract, and due to the undue influence, Annabelle had been unable to competently enter into the transaction. Appellee contends that ample evidence supports the decision. We agree. Joanne testified that when she approached Annabelle about selling, Annabelle would not respond, completely ignoring Joanne. Joanne, being unable to elicit a favorable response on her own, turned to Reynolds to intervene to work out an agreement for the purchase. The only negotiation took place in Reynolds's office, and Annabelle had not done any investigation into the value of the property. Annabelle

was unable to recall when she had sold the property and initially testified that she could not remember going to Reynolds's office, but later stated that she seemed to remember the meeting, adding that she had "had so much on [her]."

Reynolds convinced Annabelle to sell her interest in the property to Joanne and Charles for $150,000, and Annabelle was to self-finance the sale, with Joanne and Charles paying 5 percent interest and $1000 per month. Reynolds and Joanne were realtors. Joanne knew that, three years earlier, Annabelle had not been qualified to serve as her brother's guardian because she had limited business experience and mental capacity, yet Annabelle was not represented during the sale process. The $1000 payments Annabelle was receiving showed no additional payment for interest, and Joanne was unable to testify as to the balance remaining under the conveyance nor was there a promissory note supporting the terms of the transaction or an amortization schedule to provide information as to the current debt owed to Annabelle.

Mental weakness, although not to the extent of incapacity to execute a deed, may render a person more susceptible to fraud, duress, or undue influence, and, when coupled with any of them, or even with unfairness, such as great inadequacy of consideration, may make a contract voidable, when neither such weakness nor any of these other things alone would do so. *Watson, supra.* When all the evidence in the record is considered, the circuit court's determination that Annabelle was incompetent and subject to undue influence is not clearly erroneous.



IV. *Consideration*

A property owner who is competent may dispose of property as he or she sees fit, and the question of consideration is immaterial when a conveyance is voluntary. *Rose*, *supra*. Appellants claim that the issue of consideration is irrelevant in regard to the 2006 transfer of the Grassy Lake share, not only because it was a voluntary conveyance, but also because it was a gift. *Fletcher v. Fletcher*, 2011 Ark. App. 89, 381 S.W.3d 129 (elements of an inter vivos gift: (1) sound mind of donor; (2) delivery of the property; (3) intent to make an immediate, present, final gift; (4) release by the donor of future dominion and control over the property; and (5) acceptance by donee)). Appellants claim that each of the elements of a valid gift were met here.

Appellee contends that lack of consideration is a relevant factor because it must be viewed in conjunction with the undue influence found by the circuit court. A present grant, absent fraud, mistake, or undue influence, which is delivered, accepted, and recorded, is valid without consideration. *Goodwin v. Lofton*, 10 Ark. App. 205, 662 S.W.2d 215 (1984). Gross inadequacy of price is a circumstance bearing on the question of mental capacity. *Watson*, *supra*. We agree that the transfer of the Grassy Lake stock worth at least $400,000 for no consideration is relevant to Annabelle's mental capacity.

Appellants argue that $150,000 was adequate consideration for the purchase of Annabelle's three-quarter interest in the 180 acres. They point to their acquisition of the remaining one-quarter interest for $45,000. Accordingly, they paid $195,000 for the 180-acre tract. Appellants argue that Bert Clem, a real-estate broker, testified that in his opinion the property was worth $425,000, but he did not opine what an undivided three-fourths

SLIP OPINION

interest was worth in 2009. Bobby Kesterson, a certified real-estate appraiser, testified that the best use of the property was for timberland, that in 2009 the bare land was worth $750 per acre, and his written appraisal reflected a value of $139,000. Kesterson also assumed that Jeff Neill's appraisal of the timber at $117,000 was correct, and he testified that a house located on the property was worth about $50,000.

The circuit court concluded that the value of the 180 acres, including timber and improvements, was $302,637.50, and that the Blacks paid "less than market value price" for the property. Appellants contend that this is not a ground for setting aside the conveyance. *Rose*, *supra* (inadequacy of consideration does not afford grounds for setting aside a voluntary conveyance). Appellants claim that the inadequacy of price must be so great that it shocks the conscience before it may constitute setting aside a deed. *Aberdeen Oil Co. v. Goucher*, 235 Ark. 787, 362 S.W.2d 20 (1962); *Sims v. Stovall*, 127 Ark. 186, 191 S.W. 954 (1917); *McDonald v. Smith*, 95 Ark. 523, 130 S.W. 515 (1910).

Appellants argue that the terms of their purchase, $150,000 at 5 percent interest for a three-fourths interest in the property, would have been 66 percent of the amount that the circuit court determined the property to be worth. They contend that their purchase price does not shock the conscience. Annabelle testified that Jeff Neill had appraised the property in 2006, and Reynolds testified that the purchase price had been based on that and was discounted because of the partial interest. Appellants claim that this is not a situation where Annabelle was ignorant of the facts or did not have access to the same information as Joanne and Charles. They also claim that they paid significantly less for the remaining interest in the property—$45,000, or $250 per acre. Using the circuit court's $302,637.50, the

SLIP OPINION

remaining one-fourth interest was worth about $75,000. Therefore, appellants maintain that the consideration for the deed in 2009 does not shock the conscience, and even though the price might have been inadequate as viewed by appellee, that is not a sufficient basis to undo a voluntary conveyance under Arkansas law.

However, we agree with appellee's assertion that inadequate consideration is a relevant factor in determining Annabelle's mental capacity. Appellee argues that appellants incorrectly focus on inadequate consideration as the sole reason for the circuit court's holding the 2009 deed null and void. We hold that the circuit court's finding regarding consideration is but one factor in its determination of the existence and effect of undue influence and mental incapacity in the execution of the deed. *Watson*, *supra*. All the evidence supports the finding that Annabelle was underpaid for her interest in the land, and the supreme court has recognized that the fact that a grantor is old and in feeble health is a circumstance bearing on the question of mental capacity, as is gross inadequacy of price. *Id*. Therefore, we affirm on this issue.

V. *Judgment for Cut Timber and Rescission*

Appellants contend that the judgment against Joanne and Charles in the amount of $52,605.56, representing three-fourths of the timber proceeds, was based on the circuit court's erroneous order declaring null and void the 2009 deed. Because the circuit court was not clearly erroneous in its decision to void the 2009 deed from Annabelle, the judgment against Joanne and Charles for harvesting timber off the property is valid and affirmed.

Appellants also argue that, as a matter of law, the parties must be put into the same position as they were prior to the transaction, and the circuit court's order does not return the parties to their prior positions. *Cardiac Thoracic & Vascular Surgery, P.A. Profit Sharing Trust v. Bond*, 310 Ark. 798, 840 S.W.2d 188 (1992). They argue that the monthly payments made to Annabelle should have been returned to them, along with the $75,000 in improvements to the cabin at Grassy Lake.

In cases of rescission, the parties are entitled to be placed, as nearly as circumstances will permit, in their respective positions at the time of the conveyance. *Bates v. Simmons*, 259 Ark. 657, 536 S.W.2d 292 (1976). Restoration or return to status quo is governed by equitable principles. *Id.* Equity requires that if two parties must suffer, the burden must be borne by the one who induced the loss. *Lane v. Rachel*, 239 Ark. 400, 389 S.W.2d 621 (1965). In cases of rescission, the party in possession of the land is deemed to owe payments for the rental value of the property, in addition to interest on those amounts. *Bates*, *supra*. The testimony at trial was that the fair rental value of the property was $1000 per month, and appellee requested that these payments be applied as rents.

Further, we agree with appellee's contention that the evidence does not support any return on the improvements made by Reynolds on the cabin. There was no evidence of any increase in value to the property, and absent such evidence, trial courts do not err in not awarding these damages. *Heifner v. Hendricks*, 13 Ark. App. 217, 682 S.W.2d 459 (1985). Further, appellee requested that the trial court consider the value of any improvements to be in compensation for the use of the stock and its hunting rights. Accordingly, the circuit court's order is not clearly erroneous.

VI. *Statute of Limitations*

Appellants argue that appellee's claims regarding the 2006 stock transfer were barred by the statute of limitations. They contend that Arkansas Code Annotated section 16-56-105 (Repl. 2005) imposes a three-year statute of limitations for claims founded on any contract or liability not in writing, as well as for claims of fraud. An action on a writing, including setting aside a deed, has a five-year limitations period. Ark. Code Ann. § 16-56-111. Appellants contend that appellee's claims arise out of alleged fraud or undue influence on the part of appellants. They claim that the three-year statute applies, but argue that, even if the five-year limitation applies, the claims are time-barred because over seven years passed after June 2006 before the complaint was filed on November 18, 2013.

Appellants also contend that the statute tolling the limitation would not apply, as argued by appellee, because Annabelle was not under a disability at the time of the stock transfer. *See* Ark. Code Ann. § 16-56-116(a). Appellants contend that there was no testimony by Dr. Feir that Annabelle was incompetent in June 2006, and Annabelle did not have a guardian until 2013. Therefore, appellants argue that to say Annabelle was incompetent at the time of the transfer would be speculation.

Appellee first contends that the statute of limitations is an affirmative defense and appellants failed to raise this defense at trial and did not get a ruling on the issue. He contends that "it is well established that 'something more than a mere assertion of an argument in the pleadings is required to preserve the issue for appellate review.'" *Shelter Mut. Ins. Co. v. Kennedy*, 347 Ark. 184, 188, 60 S.W.3d 458, 461 (2001). However, regardless of whether the issue is preserved, appellee's claim is not time-barred. Appellants'

contention that Annabelle's disability did not exist at the time the cause of action accrued is inaccurate, as set forth above, and is contrary to our affirmation of the circuit court's finding that Annabelle was acting under a mental incapacity in June 2006.

## VII.  *Attorney's Fees*

Appellants contend that the circuit court erred in awarding attorney's fees. Appellants first claim that there is no evidence in the record that appellee requested an award of attorney's fees or specified the statute, rule, or agreement expressly authorizing an award of fees, pointing out that even though the circuit court's order states that appellee's counsel submitted an affidavit for fees and costs, neither the circuit court docket nor the record on appeal reflect any such affidavit.  Appellants argue that this is fatal to the award, citing *Crawford & Lewis v. Boatmen's Trust Co.*, 338 Ark. 679, 1 S.W.3d 417 (1999), where the Arkansas Supreme Court could not reach the merits of whether the chancellor inadvertently omitted in the order any provision for attorney's fees to the bank for its successful defense against Crawford & Lewis's petition because Boatmen's failed to submit a proper motion for fees under Arkansas Rule of Civil Procedure 54(e) (1999).

Second, appellants claim that there is no applicable statute, rule, or agreement authorizing an award of fees, which is fatal to the award.  *Barnhart v. City of Fayetteville*, 335 Ark. 57, 977 S.W.2d 225 (1998).  Appellants argue that this was not a breach–of–contract action that entitled appellee to fees because the entire case centered on a theory of fraud and undue influence, which are tort theories to which Arkansas Code Annotated section 16–22–308 does not apply.

SLIP OPINION

Third, appellants contend that an attorney's-fee award must be reasonable and, here, there was no motion or affidavit filed of record and, therefore, no way to assess reasonableness of the request. And fourth, appellants complain that the judgment is joint and several, yet the circuit court did not adjudicate any cause of action against Reynolds or award relief against him. Thus, appellants claim that the fee award is error.

Nevertheless, we hold that any objection appellants may have had was not preserved for appeal, and this court cannot address the merits of their argument. Appellee asserts that appellants never objected to (1) the circuit court's directions, during the trial or in its posttrial order, that attorney's fees would be determined posttrial, (2) appellee's application for attorney's fees to the circuit court, or (3) the order awarding such fees. Nor did appellants file a posttrial motion objecting to the award. Failure to object to an award of attorney's fees to the circuit court constitutes a waiver of the objection. To preserve the issue of attorney's fees for review on appeal, an appellant must raise the issue to the circuit court at least by filing a motion to amend the judgment pursuant to Arkansas Rule of Civil Procedure 52(b). *Washington v. Kingridge Enters.*, 2014 Ark. App. 705, 450 S.W.3d 685.[4]

In their reply brief, appellants contend that the issue of attorney's fees is preserved, arguing that there was no fee petition for them to challenge. Further, they claim that in their posttrial motion under Rule 52, they asked for dismissal of appellee's complaint "at Plaintiff's cost," among other relief. They argue that, in other words, appellants asked that

---

[4]We acknowledge that appellants contend that, contrary to the statement by the circuit court, an affidavit was not filed and the circuit court awarded attorney's fees without proper documentation. In that event, appellants should have filed a postjudgment objection to bring the issue to the attention of the circuit court. *See Washington*, *supra*.

appellee bear his own costs, which includes attorney's fees, as set forth in the circuit court's order, and the circuit court denied that request. Appellants contend that their request for relief on this issue via posttrial motion is sufficient to preserve the issue for appeal under *Washington, supra*. Regardless, appellants contend that reversal of the circuit court's order on the merits of this case necessarily requires reversal of the attorney's fee award.

Appellants' argument is not well taken because, in order to preserve an issue for appellate review, appellants were obligated to obtain a specific ruling on it from the circuit court. The Arkansas Supreme Court has held that it will not review a matter on which the trial court has not ruled, and a ruling should not be presumed. *Fordyce Bank & Trust Co. v. Bean Timberland, Inc.*, 369 Ark. 90, 94, 251 S.W.3d 267, 270 (2007). Accordingly, we cannot presume that the circuit court considered attorney's fees when it ruled on appellants' request for appellee to bear his own costs.

Affirmed.

KINARD AND HIXSON, JJ., agree.

*The Rose Law Firm*, by: *Amanda K. Wofford*, for appellants.

*Dunn, Nutter & Morgan, LLP*, by: *James L. Cook*, for appellee.