Cite as 2026 Ark. App. 277

# ARKANSAS COURT OF APPEALS
## DIVISION I
### No. CV-24-570

|  |  |
|---|---|
| JERRY POOLE<br><br>APPELLANT<br><br><br>V.<br><br><br><br>HOLLIE ANN GRICE ARNOLD, INDIVIDUALLY AND AS GUARDIAN OF THE PERSON AND ESTATE OF THOMAS M. MARSHALL, DECEASED; AND LYNN B. MARSHALL, INDIVIDUALLY<br><br>APPELLEES | Opinion Delivered May 6, 2026<br><br>APPEAL FROM THE CHICOT COUNTY CIRCUIT COURT [NO. 09CV-23-105]<br><br><br>HONORABLE QUINCEY ROSS, JUDGE<br><br><br><br>AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

## ROBERT J. GLADWIN, Judge

This appeal arises out of judgments in favor of the appellees, Hollie Ann Grice Arnold, individually, and as guardian of the person and estate of Thomas B. Marshall, deceased; and Lynn B. Marshall, individually (collectively, "the appellees"), wherein a jury found that the appellant, Jerry Poole, committed fraud or breach of contract and that Thomas Marshall ("Thomas") lacked the capacity to enter the contract for the sale of property he shared with his wife, Lynn Marshall ("Lynn"), along with 107 acres, furniture, fixtures, and farm equipment located in Chicot County. Poole also appeals the circuit court's April 23, 2024 order declaring that the money paid to the appellees should be deemed rent for the use and possession of the property as well as the court's order vesting title to the

property entirely in Lynn due to Thomas's death. We affirm in part and reverse and remand in part.

## I. *Background Facts*

In January 2023, Poole approached Thomas and Lynn (collectively "the Marshalls") about purchasing their property for $500,000; the agreement included the land (107 acres of real property) and all personal property on the land, which included all their farm equipment, furniture, and fixtures. Poole represented to the Marshalls that they could live on the property until their deaths, and he would provide help, care, and maintenance for them seven days a week and twenty-four hours a day. Poole also agreed that the deed for the property would be held in trust until all payments on the note were paid and offered a downpayment of $75,000.

On February 24, 2023, the Marshalls entered into a purchase agreement with Poole for the sale of their home and 107 acres located at 1947 South Highway 65, in Eudora, Arkansas. The parties also signed a first addendum, which detailed the living arrangements, including but not limited to, a provision requiring Poole to provide, at his cost and expense, good quality in-home care and in-home healthcare seven days a week, twenty-four hours a day, for as long as the Marshalls remained in the home.

On September 12, 2023, Hollie Ann Grice Arnold—individually and as representative of Thomas's estate—and Lynn, individually, filed their complaint against Poole for fraud and breach of contract. In the complaint, the appellees allege that Poole, knowing of the Marshalls' advanced ages and Thomas's dementia, fraudulently induced them into the sale

by promising the Marshalls a life estate on the property and to provide for their care and maintenance until their deaths. The appellees alleged that Poole entered into the agreement with no intention of following through with his end of the deal. They claimed that Poole breached the contract by failing to provide for their care and maintenance as agreed, including that Poole was using the installment payments on the sale to pay for the Marshalls' limited caretaking rather than paying for that care himself as agreed. As relief for Poole's fraudulent inducement and breach of contract, the appellees asked the circuit court to find the deed transferring the home and 107 acres null and void and to set it aside; that any money Poole paid should be considered rent for his use and possession of the property, with no money returned to him; and that Poole not be entitled to any money for his so-called improvements to the property because said "improvements" were actually damage to the property. Additionally, the complaint alleged that Poole had been turned into the Adult Protective Services (APS) division of the Arkansas Department of Human Services (DHS), and the APS investigated and determined the allegations of financial exploitation, psychological abuse, and mental abuse were founded against Thomas.

In response, Poole filed an answer denying most of the allegations in the complaint; however, he did admit that Thomas had dementia. Poole raised several affirmative defenses in his answer. On December 13, 2023, Poole filed an amended answer and asserted that the appellees failed to elect between legal and equitable remedies and argued that he was entitled to recover and offset "all sums expended on the property and all expenses incurred in reliance on the validity of the contract and conveyance."

3

The matter proceeded to a jury trial on December 13. During the appellees' opening statement, Poole moved for a mistral, arguing that counsel's reference to Poole's receipt of a piece of mail wherein the State had investigated allegations of elder abuse and financial exploitation was highly prejudicial. Poole maintained that someone from the State needed to be in attendance at trial to substantiate the findings. The circuit court denied Poole's motion for a mistrial and held that the information—whether used during direct or cross-examination—could be used for impeachment purposes and that counsel would be allowed to ask about it. Poole did not request a limited or cautionary jury instruction.

The appellees presented testimony from two of Thomas's medical providers, Dr. Kenneth Stephens and a nurse practitioner, Clark Roberts; caregiver, Ramonda Wilson; housekeeper, Gwen Whittington; attorney, Don Carroll; and Poole. Dr. Stephens, a psychiatrist and lawyer, testified that he had examined and evaluated Thomas as his treating psychiatrist and determined that Thomas would not have had the mental capacity in February or March 2023 to enter into any legal document. Clark Roberts, Thomas's nurse practitioner for the last five years of his life, testified that Thomas had been deteriorating mentally for years. For instance, Mr. Roberts testified that in June 2022, Lynn took over the finances because Thomas's dementia impacted his ability to handle his affairs. Mr. Roberts also recalled several occasions before February 2023 when he would visit Thomas, and Thomas would not remember seeing him. Mr. Roberts also opined, on the basis of his knowledge and treatment of Thomas, that Thomas was not mentally competent or capable of executing any legal documents for at least the last two years.

4

Ramonda Wilson testified that the first time she arrived at the residence to meet with Poole about being the Marshalls' caregiver, the Marshalls could not let her inside because the doors were locked. She stated that the house was in disarray, filthy, and not a safe place for the Marshalls to be living. Ms. Wilson also testified that she overheard Lynn telling Thomas that she was afraid of Poole and that when Lynn went to sleep, she locked her door. Gwen Whittington was hired as a housekeeper for the Marshalls in November 2022. Her first day of work was February 27, 2023. She testified that Poole told her to "keep them happy until closing." Regarding Thomas's mental capacity, Ms. Whittington testified that he could not remember things, and she did not believe he was capable of understanding and entering into discussions about business. She testified that she overheard a conversation between Thomas and Poole wherein Poole was attempting to convince Thomas to transfer the apartment complexes he owned to Poole's corporation. Ms. Whittington also confirmed that Poole did not provide twenty-four-hour-a-day care for the Marshalls and that they were left alone at night.

Attorney Don Carroll testified that he had known Thomas for many years and had previously done business with him, but he had not seen him in years when Poole brought the Marshalls to his office. Mr. Carroll explained that he did not prepare the original documents, although he did make some suggestions concerning the documents, and that those documents were not finalized or signed in his office. Mr. Carroll testified that on February 6 and 22, 2023, Thomas was not "himself" and that he was "kind of like a zombie."

In retrospect, Mr. Carroll said he does not believe Thomas knew what was going on or understood any of it.

Poole testified that he was aware of Thomas's dementia. He testified that Mr. Carroll prepared the purchase agreement and addenda and that his attorney, Ron Gillert, prepared the note and the mortgage. Poole testified that he upheld the terms of the agreement but acknowledged that he did not hold the deed in trust—as required by the contract—and the deed was filed with the county instead. Poole explained that after the agreements were executed, he began making monthly mortgage payments of $3,044 a month in his name for the benefit of the Marshalls at the Bank of Lake Village. He testified that he used this amount to pay the housekeeper, to buy food, and to pay the Marshalls' caregivers. Regarding the DHS investigation and letter, Poole denied receiving the document in the mail but explained that his attorney had appealed the determination. Counsel for the appellees moved to introduce the DHS letter as an exhibit, and Poole's counsel stated he had no objection. On cross-examination, Poole's counsel questioned him at length regarding the substance of the investigation and the determination. Poole moved for a directed verdict at the close of the appellees' case; the circuit court denied the motion.

Poole called Lynn Marshall and Braxton Elliott, a title agent and owner of Southeast Arkansas Title and Escrow, as witnesses. Lynn testified that she and Thomas had "wondered what [they] would do with the property," considering Thomas's dementia and her age. She explained that they were approached by Poole, who offered to buy the property from them for $500,000; in return, Poole would get the property, home, and all personal property on

6

the land following the Marshalls' deaths. Lynn testified that Poole did not hold up his contractual obligations. She explained that Poole did not provide the help, care, and maintenance that he agreed to pay for as part of the purchase agreement, and he reneged on his representation that they would have a life estate allowing them to remain on the property until their deaths.

Lynn further testified that Poole "pushed [her] to do – do things that he wanted done." She stated that Poole was always the "boss" and that she felt pressured to sign the documents because Poole "wanted to get it done quickly" and made her sign everything at their house with only the three of them present. She also testified that Poole would block the driveway so that no one could get to the house, including her family, and that Poole generally "had control of us." Lynn further stated that she knew Poole was supposed to be making mortgage payments but that they "hadn't seen any money."

Braxton Elliott testified that her title company closed the real estate transaction between Poole and the Marshalls. She testified that both Lynn and Thomas appeared to be of sound mind when they signed the warranty deed and that she notarized the deed thereafter. Ms. Elliott also confirmed that Poole did not hold the deed in trust until the note was paid in full as the agreement required, and the note provided the Marshalls no security in the way of a mortgage. At the conclusion of all evidence, Poole again moved for a directed verdict. Poole argued, "It is obvious that a contract was established" through Lynn's testimony, and the agreement was not the "result of undue influence, duress, or any other

kind of matter that would cause this contract not to be enforceable." The circuit court denied the motion.

Thereafter, the court determined that a combination of jury instructions requested by the appellees and Poole were proper, including Poole's requested instructions pertaining to the contract claim. The instructions included one interrogatory and a general-verdict form requesting that the jury answer two questions:

> - Do you find by a preponderance of the evidence that Thomas Marshall lacked the capacity to enter into a contract for the sale of real and personal property at the time they were induced into such a sale by Jerry Poole?

> - Do you find that Jerry Poole committed fraud or a breach of contract, which was a proximate cause of any damages to Plaintiffs?

The jury was not asked to determine a damages award, and Poole did not make any request for the jury to make a determination on whether he would be entitled to a set-off.

The jury found that Thomas lacked the capacity to contract and that Poole had committed either fraud or breach of contract. Poole moved for a judgment notwithstanding the verdict because "[t]he evidence is not sufficient to determine, by a preponderance of the evidence, that there was any kind of fraud that could be made against Mr. Marshall," and because Lynn knew what she was doing, even if Thomas lacked capacity, there is no proof that Lynn lacked capacity and so this is a matter of joint tenancy. The circuit court denied the motion.

On December 21, 2023, Poole moved for equitable relief due to the rescission of contract that resulted from the jury's findings. The appellees answered, denying that Poole

was entitled to such relief and counterclaimed for damages. The circuit court entered its judgment on January 8, 2024, and found as follows:

> That as a result of the above verdict form, relief prayed for in the Plaintiffs complaint is granted.

> Specifically the contract for the sale of the home, 107 acres, furniture, fixtures, and farm equipment is hereby nullified and void; that the warranty deed, filed in Chicot Count, AR of record, Book Real 2023 Page 946-950 on March 7, 2023, wherein Thomas B. Marshall and Lynn B. Marshall conveyed their home and 107 acres to Jerry Poole for consideration of $500,000 with only $75,000 being paid down is hereby declared null and void and title to the home and 107 shall be vested into Thomas B. Marshall and Lynn B. Marshall.

> We will come back to deal with the $75,000 payout.[1]

On January 26, 2024, Poole filed a notice of appeal from the judgment. Due to Poole's failure to comply with Arkansas appellate procedure, on March 21, 2024, the appellees filed a motion to execute the judgment. On April 1, 2024, Poole filed a motion for a final hearing and a final order asking the court to resolve the issue of the $75,000 down payment to make him whole and a separate motion for a new trial because "all the facts and all issues of all parties were not resolved." The appellees opposed Poole's motion for a final hearing and final order as untimely in that Poole was "asserting a compulsory counterclaim which was not timely filed and as such should be denied." Appellees also opposed Poole's motion for a new trial as untimely.

---

[1]The court made this handwritten notation on the order and marked out the prior language regarding the $75,000 downpayment being declared as rent for the use and possession of the property.

9

The circuit court held a hearing on the posttrial motions on April 23, 2024. On that same day, the circuit court entered an order finding as follows:

1) That judgment was entered in this case on January 8, 2024.

2) That relief prayed for in the Plaintiff's Complaint was granted.

3) That Plaintiff's Complaint prayed for relief that the Court find the deed to Jerry Poole null and void and set aside the same; that the money paid by Jerry Poole declared rent for use and possession of the property.

4) That the Defendant filed a Motion for New Trial on April 1, 2024.

5) That the Motion for New Trial was not filed within ten (10) days pursuant to ARCP 59 nor did the Motion for New Trial articulate or set forth any of the eight (8) reasons for a new trial by ARCP 59. Defendants Motion for New Trial is hereby denied.

6) That after the Defendant filed Notice of Appeal, pro se, on January 26, 2024, the Defendant failed to seek and obtain a supersedeas bond required by the Arkansas Appellant Rule of Civil Procedure 8. As no supersedes bond has been obtained, the Defendant Jerry Poole is not entitled to a stay of execution on the judgment. A supersedeas bond required by Arkansas Appellant Rule of Civil Procedure is in the amount of $500,000.

7) That all other relief requested by the Defendant is hereby denied.

8) That the Plaintiffs Motion to Execute on the Judgment which was filed on March 24, 2024 is hereby granted and execution can commence on the Judgment this 23rd day of April, 2024.

9) That there is no stay on the execution and Defendant is to be removed from the property immediately.

On May 1, 2024, the circuit court granted the appellees' motion to vest title entirely in Lynn's name due to Thomas's death. Poole filed a timely notice of appeal; this appeal followed.

II. *Points on Appeal*

10

Poole argues the following on appeal: (1) the circuit court erred by presenting the jury a claim for both rescission and breach of contract; (2) the circuit court erred in denying a mistrial after reference to a "true finding" in counsel's opening statement; (3) the circuit court erred by allowing admission of the DHS letter; (4) the circuit court erred in denying Poole's motions for a directed verdict and judgment notwithstanding the verdict because there was insufficient evidence to support the jury's findings of fraud, breach of contract, and lack of capacity; and (5) the circuit court erred in denying his motion for relief because any verdict sounding in rescission cannot stand if the appellees fail to return the sums Poole provided.

### III. *Discussion*

### A. Election of Remedies

First, Poole argues that the circuit court erred by submitting to the jury a claim for both rescission and breach of contract. Poole set forth in his amended answer that election of remedies was required; however, as argued by the appellees, Poole failed to raise this issue during trial or before the circuit court instructed the jury. Moreover, Poole failed to obtain a ruling on this election-of-remedies argument, and it was his responsibility to do so to preserve the issue for appellate review. *See Marcum v. Hodge*, 2023 Ark. 103, 668 S.W.3d 500 (stating that failure to obtain a ruling from the circuit court precludes review of the issue before an appellate court). Accordingly, we do not reach the merits of this argument on appeal.

### B. Mistrial

11

Next, Poole contends that the circuit court erred in denying his motion for a mistrial when the appellees' attorney referenced the DHS letter in opening statements. Specifically, he argues that reference to the DHS letter and "true finding" was "incredibly prejudicial in light of the allegations of fraud." Furthermore, Poole contends that the circuit court erred by giving no limiting instruction or direction to the jury on how to construe the statements.

The statements in question took place during the appellees' opening statement. Counsel was describing Thomas's mental capacity and stated, "Mr. Poole gets his mail there at that residence, and he got a piece of mail, where the State has made the determination and some allegations of elder abuse and financial exploitation and he—." At this time, Poole objected and requested a mistrial. Poole maintained that someone from the state needed to be in attendance to substantiate the DHS letter, that it was highly prejudicial, and that it was irrelevant. The circuit court denied the mistrial request and held that the information regarding the DHS letter could be used during direct or cross-examination for impeachment purposes. Subsequently, when the appellees' attorney sought to admit the letter at trial, Poole's attorney responded that he had "no objection" to the document being admitted as an exhibit.

A mistrial is an extreme and drastic remedy that the circuit court will resort to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when fundamental fairness of the trial has been manifestly affected. *Moore v. State*, 355 Ark. 657, 144 S.W.3d 260 (2004). Declaring a mistrial is proper only when the error is beyond repair and cannot be corrected by any curative relief. *Brown v. State*, 347 Ark. 308,

65 S.W.3d 394 (2001). The circuit court is in a better position than anyone else to evaluate the impact of any alleged errors. *Venable v. State*, 260 Ark. 201, 538 S.W.2d 286 (1976). Therefore, the circuit court has wide discretion in granting or denying a motion for mistrial, and the decision of the circuit court will not be reversed except for abuse of that discretion or manifest prejudice to the complaining party. *Hall v. State*, 314 Ark. 402, 862 S.W.2d 268 (1993).

Here, Poole's argument fails because he expressly acquiesced when the appellees sought to introduce the document as an exhibit during trial. *See Nowlin v. State*, 2024 Ark. App. 607, 704 S.W.3d 173 (holding that to preserve an argument for appellate review, absent a ruling on a pretrial motion in limine, a defendant must object to the admission of evidence at the first opportunity and then renew his objection each time the evidence is elicited, otherwise the argument is waived). Nonetheless, the circuit court specifically instructed the jury at the conclusion of the trial that "[o]pening statements, remarks during trial and closing arguments of attorneys are not evidence but are made only to help you in understanding the evidence and the applicable law," and our supreme court has held that a similar admonition to the jury cures any possible error; thus, there was no resulting prejudice. *See Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001).

### C. Admissibility of DHS Letter

Poole continues with his argument that the DHS letter and testimony regarding the letter were inadmissible and argues that the circuit court erred by allowing it to be admitted. As discussed above, Poole did not preserve the argument for this court's review. By his own

acknowledgment, Poole did not object to admission of the letter when the exhibit was introduced. Rather, he maintains that his objection during appellees' opening argument was sufficient to preserve the inadmissibility-of-the-document argument on appeal. We disagree.

Our appellate courts have consistently held it is axiomatic that an appellant's failure to make a contemporaneous objection prevents him from asserting on appeal any error on the part of the circuit court for admitting the evidence. *See, e.g., Johnson v. State*, 2017 Ark. App. 373, 523 S.W.3d 908. Here, Poole not only failed to make a contemporaneous objection to the admission of the DHS letter at trial, but he affirmatively consented to the introduction of the evidence by stating he had no objection; therefore, this argument is waived on appeal. *See id.*

## D. Sufficiency of the Evidence

### 1. *Fraud*

Poole argues that the judgment in favor of the appellees must be reversed because there is no substantial evidence of fraud. Specifically, Poole maintains that the appellees failed to prove a false statement of material fact that was reasonably relied on by Thomas and Lynn. In response, the appellees maintain that Poole is improperly seeking to extend the scope of his directed-verdict motion on appeal. We agree.

At trial, Poole argued that there was no evidence to establish fraud because the Marshalls knew what they were doing when they entered into the contract. A party is bound by the nature and scope of the arguments made at trial and may not enlarge or change those grounds on appeal. *See Daniels v. State*, 2019 Ark. App. 507, 588 S.W.3d 407. Furthermore,

Arkansas Rule of Civil Procedure 50(a) (2025) provides in part that a "motion for a directed verdict shall state the specific grounds therefor." The purpose of this requirement is to ensure that the specific ground for a directed verdict is brought to the circuit court's attention. *Ouachita Wilderness Inst., Inc. v. Mergen*, 329 Ark. 405, 947 S.W.2d 780 (1997) (citing *Stacks v. Jones*, 323 Ark. 643, 916 S.W.2d 120 (1996)); *see also Wal-Mart Stores, Inc. v. Kilgore*, 85 Ark. App. 231, 148 S.W.3d 754 (2004). Failure to state the specific grounds for relief in a directed-verdict motion precludes this court's review of the issue on appeal. *Id.*

Because Poole's argument—that there was no proof of a material misstatement or reasonable reliance on such by the Marshalls—was not made before the circuit court, this argument is not preserved for appellate review. *See, e.g., Curtis v. State*, 2026 Ark. App. 94, 730 S.W.3d 70.

### 2. *Breach of contract*

Poole contends that the "breach of contract claim failed" and cites the substantial evidence standard of review. However, his argument focuses almost entirely on the existence of a contract between him and the Marshalls rather than a lack of evidence that he breached said contract. On review, it is not this court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Advanced Envtl. Recycling Techs., Inc. v. Advanced Control Sols., Inc.*, 372 Ark. 286, 275 S.W.3d 162 (2008). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* In determining whether there is

15

substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

Here, the only facts and argument offered to support his assertion that the breach-of-contract claim "failed" was that counsel for the appellees "appeared to concede that he did not cash checks sent to him based on his clients' allegations that [Poole] breached the contract and of fraud." Because the appellees' breach-of-contract argument did not rest entirely on Poole's alleged failure to make payments to the Marshalls, this argument is meritless. Poole testified at trial that he filed the deed rather than holding it in trust until the note was paid in full per the terms of the agreement. This testimony was confirmed by Ms. Elliott with Southeast Arkansas Title and Escrow, who testified that the deed was filed on March 7—the same day it was executed.

Accordingly, there was substantial evidence to demonstrate that Poole breached the contract. There was also evidence that Poole failed to provide "good quality in-home care and in-home healthcare 7 days a week, 24 hours a day" to the Marshalls while they remained in the home as required by the terms of their agreement. Therefore, viewing the testimony and evidence in the light most favorable to the appellees, we find that substantial evidence supported the jury's factual finding that Poole breached the contract.

### 3. *Incapacity*

Poole also challenges the jury's factual finding that Thomas lacked the capacity to contract. The appellees, however, maintain that the record is replete with testimony and medical evidence to support the jury's finding. We agree.

16

Dr. Stephens and Nurse Practitioner Roberts opined that Thomas would not have been competent or had the capacity to contract when the agreement was entered in February or March 2023. The housekeeper, Gwen Whittington, testified that she did not think Thomas knew what was going on the day of closing and that he was "confused." Additionally, Mr. Carroll testified that when Thomas and Lynn visited his law office in February 2023, Thomas was "kind of like a zombie," and in retrospect, he did not believe that Thomas understood what was happening. Because there was substantial evidence in the record to support the jury's finding that Thomas lacked the capacity to contract when the agreement was entered, we affirm.

### E. Denial of Motion for Restitution and Equitable Relief

Finally, Poole alleges that the circuit court erred by denying his motion for restitution and other equitable relief because the contract was rescinded by the court; therefore, it was required to place him in his precontract position. Specifically, Poole maintains that granting rescission and denying damages to make him whole are inconsistent with the law.

After trial but before the judgment was entered, Poole filed a motion for restitution and equitable relief. In the motion, Poole declared that he was entitled to the following equitable relief: the full amount of his down payment, a reasonable amount for the Marshalls' care during his period of occupancy, and an amount to compensate him for collateral loss of profit for not being able to raise animals on the land. In response, the appellees counterclaimed for equitable relief and damages sustained during Poole's possession and use of the property. In the circuit court's April 23, 2024 order, the court

17

stated "that the money paid by Jerry Poole" is declared "rent for use and possession of the property." The order also denied "all other relief" requested by Poole.

We review traditional equity cases de novo and will not reverse the circuit court's factual findings unless they are clearly erroneous. *Hudson v. Hilo*, 88 Ark. App. 317, 198 S.W.3d 569 (2004). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* In cases of rescission, the parties are entitled to be placed as nearly as circumstances will permit, in their respective positions at the time of the conveyance. *Black v. Duffie*, 2016 Ark. App. 584, 508 S.W.3d 40. Restoration or return to status quo is governed by equitable principles. *Id.*

Here, Poole argues that *any* verdict sounding in rescission cannot stand if the appellees fail to return what he provided. He is incorrect. It is well established that in a rescission action, the purchaser has an obligation to the seller for the purchaser's possession and/or use of the property in question. *See Cardiac Thoracic & Vascular Surgery, P.A. Profit Sharing Tr. v. Bond*, 310 Ark. 798, 840 S.W.2d 188 (1992); *see also Dunham v. Phillips*, 154 Ark. 87, 241 S.W. 361 (1922) (holding that the rescinding purchaser was ordered to pay the vendor the value of the crop raised and sold on the property while the land was in the purchaser's possession); *Black, supra* (holding that the party in possession of the land owed payments for the rental value of the property in addition to interest on those amounts).

As explained above, we acknowledge that in rescission, one goal is to place the parties in the position they were in prior to the breach as argued by Poole. However, we also

18

acknowledge in recission, a seller is entitled to damages that he can prove caused by the breach as argued by the Marshalls. With that being said, here, the circuit court found that "the money [$75,000 down payment] paid by Jerry Poole" was declared as rent for Poole's possession and use of the property. That is not enough for this court to review the circuit court's finding for clear error. We are unable to determine the basis of the court's finding—or a specific dollar amount—but this may be further developed on remand. Accordingly, we reverse and remand on this issue for further findings consistent with this opinion.

Affirmed in part; reversed and remanded in part.

KLAPPENBACH, C.J., and HIXSON, J., agree.

*Tschiemer Legal Briefing*, by: *Robert S. Tschiemer*, for appellant.

*Walas Law Firm, PLLC*, by: *Breean "BW" Walas*; *Brian G. Brooks*; and *Robert G. Bridewell Attorney, PLC*, by: *Robert Bridewell*, for appellees.